# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                    No. CR 11-2002 JB

RAFAEL GOXCON-CHAGAL,
and MARIA VIANEY MEDINA-COPETE,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion in Limine to Exclude Unqualified Expert Testimony, filed April 23, 2012 (Doc. 55)("Motion in Limine"). The Court held a hearing on July 25, 2012. The primary issues are: (i) whether Ivar Hella, an agent with the Drug Enforcement Administration ("DEA"), is qualified to present expert testimony on aspects of drug organizations and narcotics investigations; (ii) whether Hella's expert testimony would be helpful to the finder of fact; (iii) whether Hella's proposed expert testimony is sufficiently reliable for the Court to permit him to testify before a jury; (iv) whether Hella's proposed testimony is improper profile evidence; (v) whether the Court should exclude Hella's testimony under rule 403 of the Federal Rules of Evidence; and (vi) whether the Court should exclude Hella's testimony on the basis that Plaintiff United States of America has not provided sufficient information regarding his proposed testimony in its notice under rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure. The Court will grant in part and deny in part the Motion in Limine. Hella is sufficiently qualified to give an expert opinion based on his training, experience, and education. Hella's testimony about the modus operandi of drug organizations, the tools of the trade of drug trafficking, and the general

aspects of narcotics investigations would be helpful to the jury.  Except on the issue whether the Defendants were traveling on a known drug route, Hella's proposed expert testimony is sufficiently reliable for the Court to permit him to testify before a jury.  If the United States seeks to present expert testimony that traveling along Interstate Highway 40 qualifies as traveling on a known drug route, it must, either pretrial or before it presents such testimony at trial, lay a proper predicate for doing so outside the presence of the jury.  Hella's proposed testimony is not improper profile evidence.  Because the risk of confusing or misleading the jury, or the risk of unfair prejudice, does not substantially outweigh the probative value of Hella's testimony, the Court will not exclude his testimony under rule 403.  Lastly, the Court finds that the United States' notice under rule 16(a)(1)(E) is sufficient, with the additional, detailed descriptions that the United States gave regarding Hella's testimony at the hearing on July 25, 2012, to comply with that rule.

## FACTUAL BACKGROUND

The Court recites the basic allegations of the case as stated in an affidavit attached to the Criminal Complaint, filed June 29, 2011 (Doc. 1).  "On June 28, 2011, . . . New Mexico State Police Sergeant Arsenio Chavez was on patrol on Interstate 40 near the 134 mile marker traveling westbound." Affidavit of Ivar Hella at 2 (executed June 29, 2011), filed June 29, 2011 (Doc. 1)("Hella Aff.").  "Chavez observed a gray Chevrolet pickup traveling too closely behind a UPS Commercial Motor vehicle."  Hella Aff. at 2.  "Chavez pulled up behind the vehicle, engaged his emergency equipment, and initiated a traffic stop."  Hella Aff. at 2.  "After making contact with the driver," Defendant Rafael Goxcon-Chagal, Chavez asked Goxcon-Chagal for his identification. Hella Aff. at 2.  Goxcon-Chagal "appeared as if he did not know where the documentation was in the vehicle and fumbled through the contents of the center console then the glove box."  Hella Aff. at 2.  Goxcon-Chagal "provided an Oklahoma driver's license with an address in Tulsa, Ok."  Hella

Aff. at 2.  Goxcon-Chagal had a "Nevada license plate" on the vehicle he was driving.  Hella Aff. at 2.  "The registration indicated the owner of the vehicle was Julio Lopez with an address in Las Vegas, Nevada along with recently purchased insurance."  Hella Aff. at 2.  While Goxcon-Chagal "was looking for the documents, Sgt. Chavez noted the following: strong chemical odor emanating from the vehicle, air freshener hanging from rear view mirror," and Goxcon-Chagal "seemed not to know exactly where the documents were located in the vehicle."  Hella Aff. at 2.

Goxcon-Chagal informed the officer that he "was en route to Oklahoma from Las Vegas, Nevada where he has been working."  Hella Aff. at 2.  Goxcon-Chagal "advised he was traveling back to Oklahoma for a ten-day vacation."  Hella Aff. at 2.  "He identified the passenger," Defendant Maria Vianey Medina-Copete, "as his wife."  Hella Aff. at 2.  Goxcon-Chagal "had a hard time identifying the owner of the vehicle and all he could say was the owner was a friend of his in Nevada."  Hella Aff. at 2.  Goxcon-Chagal and Medina-Copete eventually consented to a search of the vehicle.  See Hella Aff. at 3-4.  "K-9 Marco, who is trained and certified to detect" various drug odors, "was deployed by Sgt. Chavez and subsequently alerted both to the exterior and interior of the vehicle."  Hella Aff. at 4.  "A follow-up hand search by Sgt. Chavez located a false compartment behind the passenger side air bag."  Hella Aff. at 4.  "Upon removing the airbag a plastic piece which had been affixed to the airbag compartment was removed and revealed two packages of white glass-like substances which appeared to be methamphetamine."  Hella Aff. at 4.  "The total weight of both packages was approximately 1003.4 grams."  Hella Aff. at 4.  A "subsequent consensual search of Medina-Copete's purse revealed fake alien registration documents in her name, women's clothes and personal effects, and a Walther P99 pistol bearing serial number 009622 wrapped in a white towel."  Response to Motion in Limine to Exclude Testimony at 5, filed July 19, 2012 (Doc. 74)("Response").

-3-

## PROCEDURAL BACKGROUND

On April 19, 2012, the United States filed its United States' Notice of Intention to Offer Expert Testimony. See Doc. 52 ("Notice"). The Notice provides: "The United States anticipates that DEA special agent Ivar Hella will testify, inter alia, that the quantity of methamphetamine in question is a distributable amount, as opposed to a personal use amount." Notice at 2. The Notice states: "Special agent Hella will also quantify the monetary value of the seized methamphetamine. It is anticipated that Special Agent Hella will offer testimony regarding general aspects of narcotics investigations." Notice at 2. The United States relates that Hella's qualifications include: "He has been employed with DEA since 1998. As an agent with the DEA, SA Hella has attended a 16 week academy . . . ." Notice at 2. The United States asserts that Hella then "was assigned to the wire intercept and long term conspiracy investigations group in Tucson, Arizona for approximately three and a half years." Notice at 2. The United States notes that "Hella has been involved with numerous narcotics smuggling and distribution investigations which have resulted in the seizure of narcotics, the seizure of property, and the arrest, prosecution and conviction of the subjects of those investigations." Notice at 2. The United States relates that Hella "has personal knowledge of prices of narcotics in the Albuquerque, New Mexico area, as well as common means of packaging of various narcotics and concealment methods utilized by narcotic traffickers while transporting narcotics." Notice at 2. The United States represents that Hella "has extensive knowledge in debriefing defendants, co-conspirators, witnesses, and informants who have been involved in unlawful drug trafficking." Notice at 2. The United States asserts that individuals with experience like Hella "often know about the monies exchanged and received for drugs, as well as the techniques and methods by which drug traffickers acquire, spend, convert, transport, distribute and conceal the proceeds they derive from unlawful drug trafficking." Notice at 3. The United States notes that

"Hella's testimony will be based on his cumulative knowledge, experience, and training."  Notice at 3.

On April 23, 2012, the Defendants filed their Motion in Limine.  See Doc. 55.  They ask the Court to exclude the United States' expert testimony "regarding general aspects of narcotics' investigations" as well as "all additional testimony alleged expert testimony proposed by the prosecution by Special Agent Ivar Hella of the D.E.A. or State Police Sergeant Arsenio Chavez." Motion in Limine at 1.  The Defendants assert that the proposed expert testimony is not sufficiently reliable to withstand scrutiny under Daubert v. Merrell Dow Pharmaceuticals., 509 U.S. 579 (1993).[1] Motion in Limine at 3-5.  The Defendants contend that Hella "is not qualified to render an expert opinion regarding 'general aspects of narcotic investigations.'" Motion in Limine at 7.  They argue that "[h]is exposure to drug use and trafficking practices is limited to his experience as an officer and his attendance at training for law enforcement."  Motion in Limine at 7.  They contend:

> There has been no disclosure or indication that the officer's opinions or theories regarding drug trafficking are reliable.  There has been no peer review, nor public review.  There is no data to corroborate the potential rate of error in the officer's theory and no technique to prove them.  Thus, any opinion of the officer is a self-proclaimed theories without the requisite reliability assurances under Daubert.

Motion in Limine at 7.  The Defendants also contend that the proposed expert testimony is improper, because "[t]he prosecution's principal use of the expert witness would be to bolster its case by asking the jury to infer that because other drug smuggling situations have [occurred] a certain way, and persons in this case acted similarly, that the defendants necessarily were knowingly involved in drug smuggling."  Motion in Limine at 7.  They assert that "a jury is perfectly capable of

---

[1]In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court of the United states held that the Federal Rules of Evidence assign to the trial judge the task of ensuring that scientific evidence is sufficiently reliable such that it will assist a trier of fact.  See 509 U.S. at 592-94.

understanding what did or did not happen without the aid of a supposed expert." Motion in Limine at 8. The Defendants contend that Hella is not sufficiently qualified to be an expert and that his opinions are not sufficiently reliable to allow a jury to hear them. See Motion in Limine at 8-9. They contend that the proposed expert testimony is also improper profile evidence, "which is inadmissible as substantive proof." Motion in Limine at 13. They also argue that the Court should exclude the evidence under rule 403 in light of the potential for misleading the jury, the risk of unfair prejudice, and the risk of confusion of issues. See Motion in Limine at 15-16. They note that the issue of drugs is politically charged and can also evoke emotional responses in jurors. See Motion in Limine at 15-16. Alternatively, the Defendants argue that the Notice the United States has provided is inadequate for the Court to make a determination of Hella's qualifications and the reliability of his opinions. See Motion in Limine at 17-18. They contend that, given the deficient Notice, the Court should exclude Hella's testimony. See Motion in Limine at 17-19.

On July 19, 2012, the United States filed its Response. See Doc. 74. The United States notes that the Court has previously allowed expert testimony on "the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade." Response at 7-8 (quoting United States v. Rodriguez-Rodriguez, No. 06-5337, 2007 WL 1302584, at *1 (D.N.M. Apr. 8, 2007)(Browning, J.))(citing United States v. Hernandez-Mejia, No. 05-0469, 2007 WL 2219411, at *4 (D.N.M. Apr. 30, 2007)(Browning, J.)). The United States contends "it is well-settled that law enforcement officers, like Special Agent Hella, who are experienced in narcotics enforcement, may testify as experts on methods and operations of narcotics traffickers, and may do so absent the contrived prerequisites that defendants claim are required of all experts." Response at 8. The United States argues:

Narcotics agents are in the business of investigating and apprehending drug

> traffickers, they are not in the business of writing journal articles and defending
> dissertations. However, under defendants' logic, a 20-year veteran of the DEA
> would be barred from testifying as an expert in surveillance techniques because he
> has no peer reviewed methodology or publications. Likewise, a building contractor
> of 30 years could not provide expert testimony as to whether a foundation of a home
> was properly set unless he can provide the degree to which his theories are accepted
> in the relevant expert community. Courts have never insisted on such a mechanistic
> application of the <u>Daubert</u> factors, and this court should thus reject defendants'
> Motion <u>In Limine</u> based on such a rigid application of these guidepost factors.

Response at 8. The United States asserts that the Defendants incorrectly argue that this proposed

testimony is profile evidence, because while "profile evidence as substantive proof is disfavored,"

the Defendants "make the inferential leap that Special Agent Hella's testimony <u>must</u> be profile

evidence and therefore must be disallowed." Response at 8-9 (emphasis in original). The United

States contends that "Hella's testimony fits squarely within the type of evidence" that the United

States Court of Appeals for the Tenth Circuit has held "the jury could not understand absent

specialized knowledge." Response at 9. The United States argues that, "[a]lthough Rule 704(b)

prohibits expert opinion testimony concerning a criminal defendant's intent or state of mind, the rule

'does not prohibit experts from testifying to predicate acts from which the jury might infer such

intent.'" Response at 10-11 (quoting <u>United States v. Valle</u>, 72 F.3d 210, 216 (1st Cir. 1995)). The

United States argues that its Notice of intent to offer expert testimony is sufficient to comply with

rule 16(a)(1)(g) of the Federal Rules of Criminal Procedure. <u>See</u> Response at 14.

At the hearing on July 25, 2012, the Court stated that, based on what it has done in prior

cases and how the Tenth Circuit has handled the issue, it was inclined to permit the United States

to offer the expert testimony it has proposed. <u>See</u> Transcript of Hearing at 6:14-20 (taken July 25,

2012)(Court)("Tr.").[2] The Defendants asserted that the case is different than many of the ones the

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Court mentioned, because the defense in this case is that the Defendants did not know they were transporting drugs. See Tr. at 6:24-7:17 (Riggs). The Defendants noted that they are not disputing the value of the drugs found in the vehicle. See Tr. at 19:15-19 (Court, Gandert, Riggs). The United States asserted that the value of the drugs is still relevant, because a drug organization will not usually entrust a large amount of drugs to individuals who are outside the drug organization. See Tr. at 19:24-20:7 (Torrez). The United States argued that, while the primary issue in the case may be criminal intent, the surrounding circumstances of the arrest on which Hella will testify will have a significant impact on the jury's determination regarding intent. See Tr. at 17:21-18:4 (Torrez). The United States emphasized that, while the only issue in the case may ultimately be the Defendants' state of mind, one of the most effective methods for the United States to prove that a defendant has the requisite intent is circumstantially through the use of an expert familiar with a typical drug organization's method of operation. See Tr. at 21:20-22:9 (Torrez). The Court and the United States then discussed and set out the areas of expert testimony upon which Hella would opine, which include: (i) the significance of the route the Defendants took, the interstate route from Nevada to Oklahoma, when driving; (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle. See Tr. at 22:10-23:1 (Court, Torrez).[3] The United States related that, if the jury hears this evidence

_____

[3]The parties also referred to an eighth area for expert testimony, specifically whether the presence of a written prayer to the saint Santa Muerte provides circumstantial evidence that the

without understanding its context, they may not draw the inference that those circumstances in combination suggest that drug trafficking took place. See Tr. at 23:2-13 (Torrez). When the Court inquired why the United States had used the more general term of expertise in the general aspects of narcotics investigations in its Notice, as opposed to tools of the trade or modus operandi of drug organizations, when the Court and the Tenth Circuit have specifically addressed and on which the Court and the Tenth Circuit have allowed expert testimony, the United States clarified that it simply used poor wording in its filings and that it should have been more specific. See Tr. at 23:14-24 (Court, Torrez, Stanford). The United States related that it was not trying to propose a different field of expert testimony beyond tools of the trade and modus operandi of drug organizations. See Tr. at 24:25-25:2 (Court, Stanford).

Given the explanation of the expected subject areas for Hella's testimony, Goxcon-Chagal said he had sufficient notice of the proposed testimony such that he no longer had problems with the Notice. See Tr. at 25:1-15 (Court, Gandert). The Defendants expressed concern that Hella would provide an assessment of guilt based on his interpretation of the evidence. See Tr. at 25:16-26:3 (Gandert). The Court asked the United States for clarification that Hella would testify only as far as that he has seen similar circumstances in other cases but not testify that the Defendants must be drug couriers based on the circumstances. See Tr. at 26:4-10 (Court). The United States asserted that Hella would not testify that the Defendants must be drug couriers in light of the circumstances. See Tr. at 26:4-17 (Court, Torrez). The United States also related that Hella would not use the word profile. See Tr. at 26:24-25 (Torrez). The Defendants argued that there are a growing number of

---

Defendants were part of the drug trade. That issue is the subject of a separate motion in limine, see Motion in Limine to Exclude Unqualified Expert Testimony II, at 1-2, filed July 16, 2012 (Doc. 73), and the Court will issue a separate memorandum opinion and order addressing the Santa Muerte issue. The United States has at no point suggested that Hella will testify regarding Santa Muerte.

cases where people in the drug trade have individuals borrow cars without informing the individuals that there are drugs in the vehicle.  See Tr. at 29:12-18 (Riggs).  The United States responded that the Defendants' argument sounds like a great closing argument but emphasized that expert testimony is still proper on this matter.  See Tr. at 31:6-11 (Torrez).  The United States noted that Hella would also testify that a drug organization sometimes shields aspects of the organization from other aspects of the organization to avoid detection.  See Tr. at 32:4-16 (Torrez).

## LAW REGARDING DRUG ORGANIZATION TESTIMONY

The Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology."  United States v. Walker, 179 F.App'x 503, 507 (10th Cir. 2006)(unpublished)(quoting United States v. Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)).  This rule is based on the Tenth Circuit's recognition that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade "are not subjects with which most jurors are familiar."  United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991).  Other Circuit Courts of Appeal are in accord.  See United States v. Martinez, 476 F.3d 961, 967 (D.C. Cir. 2007)("Expert testimony about the methods of drug organizations is common in drug cases."); United States v. Robles-Rosas, 27 F.App'x 897, 899 (9th Cir. 2001)(unpublished)(holding that the district court did not abuse its discretion in permitting testimony regarding the modus operandi of drug organizations); United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994)("[T]estimony on the modus operandi of criminals 'is commonly admitted,' particularly regarding the methods of drug dealers.").  More specifically, in cases involving possession with intent to distribute, the Tenth Circuit has held that "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue."  United States v.

Mundy, 97 F.App'x 844, 846 (10th Cir. 2004)(unpublished).

"Tools of the trade may necessitate the appearance of an expert witness if the jury could not understand the significance of the possession of those items." United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000). The Tenth Circuit has held that it was appropriate for the government to present evidence regarding "typical indicia of drug trafficking activity" in a case where the government sought "to identify for the jury common red flags suggestive of an illicit pharmaceutical operation." United States v. Lovern, 590 F.3d 1095, 1102 (10th Cir. 2009). The Tenth Circuit has "upheld the admission of expert testimony detailing the significance of 'a drug dealer's tools of [the] trade: a single-edge razor blade, a pager or beeper, and a loaded pistol." United States v. Becker, 230 F.3d at 1231 (alteration in original). The Tenth Circuit has also upheld "the admission of expert testimony to 'explain[] the meaning of the physical evidence' officers 'found at the arrest scene . . . where the narcotics were confiscated." United States v. Becker, 230 F.3d at 1231. The Tenth Circuit found it permissible for an officer to testify "about the common features of drug transactions to assist the jury in understanding the nature of the drug business," including "that most drug organizations are closed and secretive and that it would not be unusual for a person who was not otherwise involved in the operation to be present during the transaction." United States v. Wilson, 276 F.App'x 859, 860-61 (10th Cir. 2008)(unpublished). The United States Court of Appeals for the Fourth Circuit has recognized that a person may properly be qualified as an expert "in the field of investigative drug trafficking" in a given geographical area. United States v. Wilson, 484 F.3d 267, 273 (4th Cir. 2007).

### LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., trial courts have had the responsibility to make certain that proffered experts

will assist the jury in understanding the evidence and in determining the factual issues it must

decide." United States v. Gutierrez-Castro, 805 F.Supp.2d 1218, 1224 (D.N.M. 2011)(Browning,

J.).  "The Court now must not only decide whether the expert is qualified to testify, but, under

Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a

reliable methodology."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1224.[4]  "Daubert v.

Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning

to determine if that reasoning is sound."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1224.

1.      **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the
> case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is

proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the

trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d 1332,

1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory

committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the

strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group

sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").

---

[4]The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals addressed in detail how
courts should determine whether opinion testimony is the product of a reliable methodology, but did
not discuss the issue whether an expert is qualified to testify.

An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. See Morales v. E.D. Etnyre & Co., 382 F.Supp.2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

### 2. The Standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court articulated a non-exclusive list of factors that weigh into a district

court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)] (quoting Daubert, 509 U.S. at 589 . . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509 U.S. at 592 . . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court), and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591)).  If the expert's

proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharmaceuticals to non-scientific expert testimony.  See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharmaceuticals will not apply to all cases:

> Our emphasis on the word may thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . .  and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted).  The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  As the

-15-

Tenth Circuit noted in <u>Hollander v. Sandoz Pharmaceuticals Corp.</u>, 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under <u>Daubert</u>, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the <u>Daubert</u> manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, <u>Daubert</u>'s effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  As the United States Court of Appeals for the Ninth Circuit noted in <u>Claar v. Burlington Northern Railroad Co.</u>, 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

<u>Ram v. N.M. Dep't of Env't</u>, No. 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.  <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable. Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); <u>In re Breast Implant Litig.</u>, 11 F. Supp. 2d at 1228 ("An untested hypothesis cannot be

a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies, including dose and route administration); Tyler v. Sterling Drug, Inc., 19 F.Supp.2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d at 1213 ("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F.Supp.2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

> **3.** **Necessity of Evaluating an Issue Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.***

The restrictions in Daubert v. Merrell Dow Pharmaceuticals apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[5] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily

---

[5]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

defended." Daubert v. Merrell Dow Pharm., 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

## EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

(a) **In General -- Not Automatically Objectionable.**  An opinion is not objectionable just because it embraces an ultimate issue.

(b) **Exception.**  In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed. R. Evid. 704.  "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, No. 05-0172, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.).  "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12

(6th ed. 2006 update)).  The Federal Rules of Evidence reflect that the ultimate-issue rule has been abolished.  See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).  Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those expressed in rule 704(b), regarding testimony on ultimate issues.  More specifically, the Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by applying the law to the facts."  A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cnty., Okla., 936 F.2d 472, 476 (10th Cir. 1991).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state."  United States v. Ganadonegro, No. 09-0312, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b).  "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."  United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the task of the courts "to distinguish [helpful] opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a legal conclusion."  United States v. Perkins, 470 F.3d at 158 (internal quotation marks omitted).  In making that determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.  See United States v. Perkins, 470 F.3d at 158.

## LAW REGARDING CRIMINAL RULE 16

"A defendant is entitled, under some circumstances, to request a written summary of expert

testimony the United States intends to use in its case-in-chief."  United States v. Gutierrez-Castro,

805 F.Supp.2d at 1227.  Rule 16 provides in relevant part:

> **Expert witnesses.** -- At the defendant's request, the government must give to the
> defendant a written summary of any testimony that the government intends to use
> under Rules 702, 703, or 705 of the Federal Rules of Evidence during its
> case-in-chief at trial.  If the government requests discovery under subdivision
> (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's
> request, give to the defendant a written summary of testimony that the
> government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as
> evidence at trial on the issue of the defendant's mental condition.  The summary
> provided under this subparagraph must describe the witness's opinions, the bases and
> reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  Rule 16 similarly provides that a defendant must produce a summary

of expert testimony under some circumstances:

> **Expert witnesses.** -- The defendant must, at the government's request, give to the
> government a written summary of any testimony that the defendant intends to use
> under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial,
> if --
>
> > (i)     the defendant requests disclosure under subdivision (a)(1)(G) and the
> >         government complies; or
> >
> > (ii)    the defendant has given notice under Rule 12.2(b) of an intent to
> >         present expert testimony on the defendant's mental condition.
>
> This summary must describe the witness's opinions, the bases and reasons
> for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has recently reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  As the Supreme Court recently noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules

401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 543 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 453 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's note).

## ANALYSIS

The Court will grant in part and deny in part the Motion in Limine. The Court concludes that Hella is sufficiently qualified to give an expert opinion based on his training, experience, and education. The Court concludes that Hella's testimony about the modus operandi of drug organizations, the tools of the trade of drug trafficking, and the general aspects of narcotics investigations would be helpful to the jury. Except on the issue whether the Defendants were traveling on a known drug route, Hella's proposed expert testimony is sufficiently reliable for the Court to permit him to testify before a jury. If the United States seeks to present expert testimony that traveling along I-40 qualifies as traveling on a known drug route, it must, either pretrial or before it presents such testimony at trial, lay a proper predicate for doing so outside the presence of the jury. The Court concludes that Hella's proposed testimony is not improper profile evidence. Because the risk of confusing or misleading the jury, or the risk of unfair prejudice, does not substantially outweigh the probative value of Hella's testimony, the Court will not exclude his

testimony under rule 403.  Lastly, the Court finds that the United States' Notice under rule 16(a)(1)(E) is sufficient, with the additional, detailed descriptions that the United States gave regarding Hella's testimony at the hearing on July 25, 2012, to comply with that rule.

## I.    HELLA IS QUALIFIED TO PROVIDE EXPERT TESTIMONY.

The Defendants contend that Hella "is not qualified to render an expert opinion regarding 'general aspects of narcotic investigations.'"  Motion in Limine at 7.  They argue that "[h]is exposure to drug use and trafficking practices is limited to his experience as an officer and his attendance at training for law enforcement."  Motion in Limine at 7.

Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by 'knowledge, skill, experience, training, or education' and . . . the 'expert' . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d at 528.  The Tenth Circuit has stated that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade "are not subjects with which most jurors are familiar," see United States v. McDonald, 933 F.2d at 1522, and that, more specifically, "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue,"  United States v. Mundy, 97 F.App'x at 846.

The Court believes that, because of the covert and unique nature of narcotics trafficking, Hella's testimony will assist the jury to understand the evidence presented at trial.  See United States v. Walker, 179 F.App'x at 507 (recognizing that the Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology").  The United States has related that Hella will testify on approximately seven areas: (i) the significance of the route the Defendants took, the interstate route

from Nevada to Oklahoma, when driving; (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle.

Courts have found that these areas on which Hella will provide expert testimony are relevant to determining whether a defendant was engaging in drug trafficking activity.  For instance, the Ninth Circuit has stated that "law enforcement expert testimony regarding drug smuggling routes is admissible evidence establishing modus operandi."  United States v. Padilla, 414 F.App'x 933, 934 (9th Cir. 2011)(unpublished)(citing United States v. Klimavicius-Viloria, 144 F.3d 1249, 1259-60 (9th Cir. 1998)).  The Tenth Circuit has noted that it can be significant that a defendant was "traveling . . . on a known drug trafficking route" in the context of a probable cause determination, see United States v. Montes-Ramos, 347 F.App'x 383, 391 & n.10 (10th Cir. 2009)(unpublished), but has cautioned against, in a case involving civil forfeiture, reliance upon generalized allegations of "known drug routes" to avoid characterizing "nearly any trip down the interstate" as travel on a drug route, United States v. $252,300.00 in U.S. Currency, 484 F.3d 1271, 1274 n.3 (10th Cir. 2007).  The Tenth Circuit has recognized that it was proper to permit expert testimony to the effect that "a drug dealer will not invite others to participate in [a more complex drug] transaction who are not aware of the nature of the transaction."  United States v. Richard, 969 F.2d 849, 855 (10th Cir. 1992).   The Ninth Circuit has "endors[ed] the admission of modus operandi testimony . . . suggesting that drug traffickers generally do not entrust large quantities of drugs to unknowing transporters."  United States v. Valencia-Amezcua, 278 F.3d 901, 909 (9th Cir. 2002).

The Fourth Circuit has held that possession of multiple cellular telephones is circumstantial evidence that a person was involved in narcotics distribution.  See United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010)("The evidence that Young was in possession of multiple cell phones . . . could likewise be viewed by the jury as evidence of a drug-distribution conspiracy . . . .").  The United States Court of Appeals for the Fifth Circuit has described how deceptive conduct with license plates is a tactic drug organizations may use.  See United States v. Herbst, 460 F.App'x 387, 391 (5th Cir. 2012)(unpublished)("Nunez thought that this was an example of 'burning plates,' a tactic used by drug trafficking organizations to run a license plate across the border several times so that it was not new in the system for the purpose of decreasing the likelihood of a detailed inspection.").  That practice of running license plates across the border is similar to having multiple license plates in a vehicle to potentially evade detection from law enforcement.  In the context of an appeal of a motion to suppress, the Fourth Circuit has also recognized that "the presence of air fresheners" supported a finding that reasonable suspicion existed, because air fresheners are "commonly used to mask the smell of narcotics."  United States v. Branch, 537 F.3d 328, 338 (4th Cir. 2008).  Accord United States v. Cantu, 426 F.App'x 253, 255 (5th Cir. 2011)(unpublished)("As he approached the vehicle to request the driver's license and registration, Rios observed at least six air fresheners in the car, suggesting an effort to mask the odor of narcotics.").  The Tenth Circuit has recognized that experts may properly testify about how drug organizations use firearms to facilitate their operations.  See United States v. Garza, 566 F.3d at 1199-1200 (stating that Tenth Circuit precedent "recogniz[es] that police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters as the use of firearms in the drug trade").

Consequently, these matters all have a potential bearing on the modus operandi of drug organizations and the tools of the narcotics trade, areas which the Tenth Circuit has recognized may

require expert assistance to aid the jury.  See United States v. McDonald, 933 F.2d at 1522.  Accord United States v. Solorio-Tafolla, 324 F.3d 964, 966 (8th Cir. 2003)("It is well within the discretion of a district court 'to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar.'").  For instance, the significance of multiple license plates in a vehicle, along with numerous air fresheners and numerous cellular telephones, may not be immediately apparent to the jury, even though these matters may be precautions a drug organization would take to avoid detection from law enforcement.  See United States v. McDonald, 933 F.2d at 1523 ("In the case before us, the basic facts were the amount of drugs and the possession of several items of personal property.  The jury could not be expected to understand this evidence without specialized knowledge.").  The particular route a vehicle takes may not appear significant without an expert to explain the significance of the route.  The Defendants' intent to transport drugs is disputed in this case, and an expert could help illustrate that this evidence has a bearing on whether the Defendants intended to transport drugs.  See United States v. McDonald, 933 F.2d at 1522 (recognizing how similar evidence was relevant "on the issue of the defendant's intent to distribute cocaine").

The United States relates that Hella's qualifications include: "He has been employed with DEA since 1998.  As an agent with the DEA, SA Hella has attended a 16 week academy . . . ." Notice of 2.  The United States asserts that Hella then "was assigned to the wire intercept and long term conspiracy investigations group in Tucson, Arizona for approximately three and a half years." Notice at 2.  The United States notes that "Hella has been involved with numerous narcotics smuggling and distribution investigations which have resulted in the seizure of narcotics, the seizure of property, and the arrest, prosecution and conviction of the subjects of those investigations." Notice at 2.  The United States relates that Hella "has personal knowledge of prices of narcotics in

the Albuquerque, New Mexico area, as well as common means of packaging of various narcotics and concealment methods utilized by narcotic traffickers while transporting narcotics." Notice at 2. The United States represents that Hella "has extensive knowledge in debriefing defendants, co-conspirators, witnesses, and informants who have been involved in unlawful drug trafficking." Notice at 2. The United States asserts that individuals with experience like Hella "often know about the monies exchanged and received for drugs, as well as the techniques and methods by which drug traffickers acquire, spend, convert, transport, distribute and conceal the proceeds they derive from unlawful drug trafficking." Notice at 3. The United States notes that "Hella's testimony will be based on his cumulative knowledge, experience, and training." Notice at 3.

Hella has worked for the DEA for almost fifteen years now. See United States v. Hernandez-Mejia, 2007 WL 2219411, at *6 (finding it significant that the United States' proposed expert "has been employed with the DEA since March 2003"). He also has significant experience investigating drug organizations as well as the methods they use to avoid law enforcement. An expert may obtain qualifications through "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Hella's history indicates that he has acquired significant knowledge, training, and experience working on drug cases. He also has some education, having attended a sixteen-week academy for law enforcement officers. Expert testimony is liberally admissible under the Federal Rules of Evidence. See United States v. Gomez, 67 F.3d at 1526. Based on Hella's training and professional experience, he is qualified to offer opinion testimony regarding the operations of narcotics trafficking organizations. To the extent that his expert opinion is otherwise admissible, the Court will admit the testimony.

Lastly, based on his qualifications, Hella is qualified to testify on the general aspects of narcotics investigations. The United States' expert Notice adopts some phrasing that "Special Agent

-27-

Hella will offer testimony regarding the general aspects of narcotics investigations." Notice at 2. The Court sought to clarify what the United States meant with this particular choice of words at the hearing on July 25, 2012. When the Court inquired why the United States had used the more general term of expertise in the general aspects of narcotics investigations in its Notice, as opposed to tools of the trade or modus operandi of drug organizations, the United States clarified that it simply used poor wording in its filings and that it should have been more specific. See Tr. at 23:14-24 (Court, Torrez, Stanford). The United States related that it was not trying to propose a different field of expert testimony beyond tools of the trade and modus operandi of drug organizations. See Tr. at 24:25-25:2 (Court, Stanford). The Court had the United States list out its proposed areas for Hella's expert testimony and, as the Court has discussed, all those matters fall within the concepts of modus operandi and tools of the trade of drug organizations. Thus, it is not necessary to have a separate area of expert testimony regarding the general aspects of narcotics investigations. Nevertheless, it is worth noting that the Tenth Circuit would likely recognize such an area given its high similarity to modus operandi and tools of the trade of drug organizations. For instance, the Tenth Circuit has found it permissible for an officer to testify "about the common features of drug transactions to assist the jury in understanding the nature of the drug business," including "that most drug organizations are closed and secretive and that it would not be unusual for a person who was not otherwise involved in the operation to be present during the transaction." United States v. Wilson, 276 F.App'x at 860-61. More directly, the Fourth Circuit has held that a person may properly be qualified as an expert "in the field of investigative drug trafficking" in a given geographical area. United States v. Wilson, 484 F.3d at 273. The Court sees no material reason that such an area of expert testimony would be objectionable, given that the Tenth Circuit recognizes that testimony regarding modus operandi and tools of the trade of drug organizations is permissible. Thus, such

an area of expert testimony is one that the Tenth Circuit would likely recognize.

## II.   EXCEPT ON THE ISSUE WHETHER THE DEFENDANTS WERE TRAVELING ON A KNOWN DRUG ROUTE, HELLA'S EXPERT OPINIONS ARE SUFFICIENTLY RELIABLE.

The Defendants contend:

There has been no disclosure or indication that the officer's opinions or theories regarding drug trafficking are reliable.  There has been no peer review, nor public review.  There is no data to corroborate the potential rate of error in the officer's theory and no technique to prove them.  Thus, any opinion of the officer is a self-proclaimed theories without the requisite reliability assurances under Daubert.

Motion in Limine at 7.  The Defendants contend that the proposed expert testimony is improper,

because "[t]he prosecution's principal use of the expert witness would be to bolster its case by

asking the jury to infer that because other drug smuggling situations have [occurred] a certain way,

and persons in this case acted similarly, that the defendants necessarily were knowingly involved

in drug smuggling."  Motion in Limine at 7.

While many of the Tenth Circuit's precedent regarding expert testimony about the modus

operandi and tools of the trade of drug organizations predate either Daubert v. Merrell Dow

Pharmaceuticals or Kumho Tire Co. v. Carmichael, the Tenth Circuit has reaffirmed those

precedents in a 2009 decision:

Mr. Garza's concern is the second requirement-reliability.  Officer Sanders's testimony was not reliable, he contends, because no conceivable "'science'" could illuminate "how an inanimate object such as a gun was or may be used."  Quoting Rule 702, he states that Sanders's "testimony had to be the product of 'reliable principles and methods' that were 'applied . . . reliably.'"  And he contends that "[u]nder Daubert, the methodology that must be employed is (1) whether the proffered theory can and has been tested; (2) whether the expert's opinion has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."

We reject Mr. Garza's Rule 702 argument.  Officer Sanders's expert opinion was not improper simply because it was not scientific.  Rule 702 authorizes opinion testimony by experts with "scientific, technical, or other specialized knowledge."

-29-

That specialized knowledge can be acquired through "experience" and "training." Moreover, although the trial judge must perform a gatekeeping role with respect to all expert testimony, not just such testimony by "scientific" experts, the reliability criteria enunciated in <u>Daubert</u> are not to be applied woodenly in all circumstances. As the Supreme Court has explained, "[T]he factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." (Although <u>Kumho Tire</u> predates the approval of the amendment to Rule 702 that added the three numbered conditions for admissibility, the amendment was intended to be fully consistent with <u>Kumho Tire</u>.) Hence, it is not essential that Sanders's opinion be supported by the four factors taken by Mr. Garza from <u>Daubert</u>. Accordingly, we do not believe that <u>Daubert</u> and its progeny (including the 2000 amendment to Rule 702) provide any ground for us to depart from our pre-<u>Daubert</u> precedents recognizing that police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters as the use of firearms in the drug trade.

<u>United States v. Garza</u>, 566 F.3d at 1198-1200 (citations omitted). The United States Court of Appeals for the Third Circuit found expert opinions to be reliable under <u>Daubert v. Merrell Dow Pharmaceuticals</u> when an officer planned to provide an opinion regarding how the following facts led to a conclusion that the defendants were transporting with intent to distribute drugs: (i) the presence of several guns in the vehicle; (ii) the presence of narcotics in the vehicle; (iii) the number of people in the vehicle; and (iv) the circumstances of the arrest. <u>See</u> <u>United States v. Davis</u>, 397 F.3d 173, 177 (3d Cir. 2005)(Sloviter, J.). In upholding the district court's admission of this expert testimony, the Third Circuit stated:

Defendants also argue that there is no objective basis for Officer Garner's testimony and that it fails the analysis required by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, because "there was absolutely no pretense of scientific method, scientific testing, peer review in publication, a known or potential rate of error, and the extent to which [Officer Garner's] theory is generally accepted." However, the factors enumerated in <u>Daubert</u> were intended to apply to the evaluation of scientific testimony, and they have little bearing in this case.

In <u>Kumho Tire Co. v. Carmichael</u>, the Supreme Court recognized that "there are many different kinds of experts, and many different kinds of expertise," and "<u>Daubert</u>'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." The Court held that <u>Daubert</u>'s list of specific factors

-30-

would often be of little use in evaluating non-scientific expert testimony and, as a result, the Court expanded <u>Daubert</u>'s general holding to apply to expert testimony based on "technical or other specialized knowledge."

Federal Rule of Evidence 702 states that a court may permit expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Under <u>Daubert</u>, a trial court must evaluate such testimony and make sure it "rests on a reliable foundation and is relevant to the task at hand."  Officer Garner's testimony fully satisfied both these requirements.  He was a fourteen-year veteran of the Philadelphia police force with twelve years of experience in narcotics.  His testimony concerned the methods of operation for drug traffickers in the South Philadelphia area, a topic which we have held is a suitable topic for expert testimony because it is not within the common knowledge of the average juror.  We are satisfied that Officer Garner's testimony concerned a proper subject matter for expert testimony, and he provided a reliable opinion based on years of experience.  His testimony was thus admissible under both the Federal Rules of Evidence and <u>Daubert</u>.

<u>United States v. Davis</u>, 397 F.3d at 178-79 (citations omitted).

In <u>United States v. Wilson</u>, the Fourth Circuit, addressing a challenge to expert testimony under <u>Daubert v. Merrell Dow Pharmaceuticals</u>, stated: "Unsurprisingly, then, courts of appeals have routinely held that law enforcement officers with extensive drug experience are qualified to give expert testimony on the meaning of drug-related code words."  484 F.3d at 275.  Explaining how evaluating the admissibility of this experience-based testimony was different than evaluating more purely science-based testimony, the Fourth Circuit related:

Experiential expert testimony, on the other hand, does not "rely on anything like a scientific method."  But this does not lead to a conclusion that "experience alone -- or experience in conjunction with other knowledge, skill, training or education -- may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts."

<u>United States v. Wilson</u>, 484 F.3d at 274 (alterations in original)(citations omitted).  The United

States Court of Appeals for the Seventh Circuit upheld the district court's admission of expert testimony drawing a connection between the defendant's possession of a gun and drug-trafficking activity based in part on the witness' "considerable experience with the customs and tools of the drug trade and his review of the police reports." United States v. Allen, 269 F.3d 842, 846 (7th Cir. 2001).  In a different case, the Seventh Circuit also affirmed a district court's decision to admit, in the face of a challenge under Daubert v. Merrell Dow Pharmaceuticals, expert testimony "about the nature, structure, and characteristics of drug trafficking operations." United States v. Cruz-Velasco, 224 F.3d 654, 659-61.  In an unpublished decision, the Ninth Circuit held that the district court improperly excluded a defendant's "'cannabis' expert who planned to testify to the following": (i) "the amount of marijuana police discovered is consistent with personal use;" (ii) "three bags of marijuana are not inconsistent with personal use;" and (iii) "the presence of scales is not inconsistent with personal use because purchasers of marijuana often have scales to make sure the seller is not short-changing them."  United States v. Thompson, No. 05-50801, 2007 WL 2044725, at *1 (9th Cir. July 16, 2007)(unpublished).

    Thus, the Circuit Courts of Appeal, including the Tenth Circuit, have largely found that expert testimony regarding the modus operandi and tools of the trade of drug organizations withstands scrutiny under Daubert v. Merrell Dow Pharmaceuticals.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Furthermore, as the Supreme Court stated in Daubert v. Merrell Dow Pharmaceuticals, "well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  509 U.S. at 593 n.11.  "[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ."  Attorney Gen. of Okla.

v. Tyson Foods, Inc., 565 F.3d at 780.  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Even though many of the principles on which Hella will testify regarding the modus operandi of drug organizations are well established, the Court will conduct an independent assessment of Hella's proposed testimony.

As a preliminary note, the factors from Daubert v. Merrell Dow Pharmaceuticals do not neatly apply to the proposed expert testimony.  The Supreme Court has recognized this scenario.

> Our emphasis on the word may thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 150 (citations omitted)(internal quotation marks omitted)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  Testing in the scientific sense of the word does not occur in the field when officers pursue drug traffickers.  While there are commentators on law enforcement practices, the Court assumes that law enforcement agencies do not generally publish law enforcement techniques in peer-reviewed journals or in books.  A potential rate of error for law-enforcement techniques, unlike an experiment, is difficult to quantify.  The Supreme Court gives as an example when discussing rate of error "the error rate of spectrographic voice identification technique." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594.  Standards

in the scientific sense do not normally apply to law-enforcement techniques, such as a "professional organization's standard governing spectrographic analysis." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594. There is no relevant medical or scientific community, although, as outlined above, the federal court system and the Tenth Circuit have generally accepted expert testimony on the modus operandi of drug organizations as reliable. See United States v. Garza, 566 F.3d at 1198-1200.

Hella's expert opinion relies largely on his experience as a law enforcement officer. The Tenth Circuit has acknowledged that experience and training are generally the basis upon which experts rely to provide testimony regarding the modus operandi of drug organizations. See United States v. Garza, 566 F.3d at 1199-1200. The advisory committee's notes to rule 702 provide the following guidance: "If the [expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2002 amendment. The United States has related that Hella will testify on approximately seven areas: (i) the significance of the route the Defendants took, the interstate route from Nevada to Oklahoma, when driving; (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle. It is important to consider the conjunctive effect of the presence of these factors in a given case. The United States emphasized that it is necessary for an expert to explain the significance of

these facts in combination, because a jury may view them individually and not understand how they interact to create a stronger inference of drug trafficking.  See Tr. at 17:21-18:4, 21:20-22:9 (Torrez).  The United States proposes to use this circumstantial evidence to prove that there was a conspiracy to distribute drugs.  As the Tenth Circuit has stated: "Circumstantial evidence is often the strongest evidence of conspiracy."  United States v. Robinson, 978 F.2d 1554, 1562 (10th Cir. 1992).   As both the Supreme Court and the Tenth Circuit have recognized, an individual's "knowledge must almost always be proved . . . by circumstantial evidence."  United States v. Santos, 553 U.S. 507, 521 (2008).  Accord United States v. Wright, 412 F.App'x 54, 56 (10th Cir. 2011)(unpublished)("Intent to distribute may be inferred from circumstantial evidence, including a large drug quantity.").  As the Tenth Circuit has discussed in a case where it was disputed whether there was sufficient evidence to conclude that a defendant "knowingly has ownership, dominion or control over the narcotics and the premises where the narcotics are found":

> Most of the evidence against Mr. Gonzalez was circumstantial; yet, a rational jury could conclude that he had mutual control over the small bathroom where cocaine was found and that he knowingly possessed the drugs.  A rational jury could also find -- based on the large quantity of cocaine in the apartment and the scales in the closet -- that the cocaine was intended for distribution, rather than personal use.  We hold that the evidence supported Mr. Gonzalez' conviction on the possession with intent to distribute count.

United States v. Dozal, 173 F.3d 787, 797 (10th Cir. 1999).  In fact, the Tenth Circuit has characterized evidence of tools of the trade as circumstantial evidence.  See United States v. McDonald, 933 F.2d at 1522 ("The possession of the remaining tools of the trade, the pager and the loaded pistol, are likewise circumstantial evidence.").  While the facts in the present case, when taken individually or a few at a time, may not create a strong inference of criminal activity, when taken together a factfinder can draw a stronger inference than it could when looking at the facts in isolation.

The Court finds it necessary to separately address the area of the significance of the route the Defendants took.  "On June 28, 2011, . . . New Mexico State Police Sergeant Arsenio Chavez was on patrol on Interstate 40 near the 134 mile marker traveling westbound." Hella Aff. at 2.  The Ninth Circuit has stated that "law enforcement expert testimony regarding drug smuggling routes is admissible evidence establishing modus operandi."  United States v. Padilla, 414 F.App'x at 934 (citing United States v. Klimavicius–Viloria, 144 F.3d at 1259-60).  The Tenth Circuit has noted that it can be significant that a defendant was "traveling . . . on a known drug trafficking route" in the context of a probable cause determination, see United States v. Montes-Ramos, 347 F.App'x at 391 & n.10, but has cautioned against, in a case involving civil forfeiture, reliance upon generalized allegations of "known drug routes" to avoid characterizing "nearly any trip down the interstate" as travel on a drug route, United States v. $252,300.00 in U.S. Currency, 484 F.3d at 1274 n.3.  The Court is concerned that, given the heavy motor vehicle traffic on I-40, Hella's proposed testimony is too close to characterizing "nearly any trip down the interstate" as traveling in a known drug route.  The Court does not have much record before it to support a conclusion that traveling on I-40 from Nevada to Oklahoma would qualify as traveling on a known drug route.  The Tenth Circuit has stated that traveling along "Highway 80 . . . through the sparsely populated 'bootheel' section of southwestern New Mexico before intersecting Interstate 10" would qualify as traveling on a known drug route.  United States v. Montes-Ramos, 347 F.App'x at 385 & n.1, 391 & n.10.[6]  Thus, if the

---

[6]The Court has similarly stated in the past, quoting from a decision from the United States Court of Appeals for the Eighth Circuit: "The facts that [a defendant]'s vehicle [has] out-of-state license plates and [is] traveling on a highway that [is] known to the officers as a drug trafficking corridor cannot alone justify [a] stop because too many people fit this description for it to justify a reasonable suspicion of criminal activity."  United States v. Grant, No. 05-2511, 2006 WL 1305037, at *6 (D.N.M. Apr. 10, 2006)(Browning, J.)(alterations in original)(quoting United States v. Yousif, 308 F.3d 820, 828 (8th Cir. 2002)).

United States seeks to present expert testimony that traveling along I-40 qualifies as traveling on a known drug route, it must, either pretrial or before it presents such testimony at trial, lay a proper predicate for doing so outside the presence of the jury.

Regarding the remaining areas on which Hella seeks to testify, courts have found that those areas are generally permissible topics for expert testimony to assist the jury in determining whether a defendant was engaging in drug trafficking activity.  The Tenth Circuit has recognized that it was proper to permit expert testimony to the effect that "a drug dealer will not invite others to participate in [a more complex drug] transaction who are not aware of the nature of the transaction."  United States v. Richard, 969 F.2d at 855.  The Ninth Circuit has "endors[ed] the admission of modus operandi testimony . . . suggesting that drug traffickers generally do not entrust large quantities of drugs to unknowing transporters." United States v. Valencia-Amezcua, 278 F.3d at 909.  The Fourth Circuit has held that possession of multiple cellular telephones is circumstantial evidence that a person was involved in narcotics distribution.  See United States v. Young, 609 F.3d at 355 ("The evidence that Young was in possession of multiple cell phones . . . could likewise be viewed by the jury as evidence of a drug-distribution conspiracy . . . .").  The Fifth Circuit has described how deceptive conduct with license plates is a tactic drug organizations may use.  See United States v. Herbst, 460 F.App'x at 391 ("Nunez thought that this was an example of 'burning plates,' a tactic used by drug trafficking organizations to run a license plate across the border several times so that it was not new in the system for the purpose of decreasing the likelihood of a detailed inspection.").  That practice running license plates across the border is similar to having multiple license plates in a vehicle to potentially evade detection from law enforcement.  In the context of an appeal of a motion to suppress, the Fourth Circuit has also recognized that "the presence of air fresheners" supported a finding that reasonable suspicion existed, because air fresheners are "commonly used

to mask the smell of narcotics." United States v. Branch, 537 F.3d at 338.  Accord United States v. Cantu, 426 F.App'x at 255 ("As he approached the vehicle to request the driver's license and registration, Rios observed at least six air fresheners in the car, suggesting an effort to mask the odor of narcotics").  The Tenth Circuit has recognized that experts may properly testify about how drug organizations use firearms to facilitate their operations.  See United States v. Garza, 566 F.3d 1194, 1199-1200 (10th Cir. 2009)(stating that Tenth Circuit precedent "recogniz[es] that police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters as the use of firearms in the drug trade").  Many of the Defendants' concerns about this evidence, such as the firearm being in the trunk or the defense that they did not know drugs were in the vehicle, go to the weight of the expert testimony rather than it being unreliable.

In addition to courts having recognized that these matters on which Hella plans to testify are relevant to the issue whether drug trafficking is taking place, nothing about Hella's background suggests he lacks the experience and training to properly testify on these matters.  Hella has worked for the DEA for almost fifteen years now.  See United States v. Hernandez-Mejia, 2007 WL 2219411, at *6 (finding it significant that the United States' proposed expert "has been employed with the DEA since March 2003").  He also has significant experience investigating drug organizations as well as the methods they use to avoid law enforcement.  An expert may obtain qualifications through "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. Hella's history indicates that he has acquired significant knowledge, training, and experience working with drug organizations.  He also has some education, having attended a sixteen-week academy for law enforcement officers.  The Court sees no gaps between his experience and his proposed testimony.  Other courts have recognized that the matters upon which he plans to testify reliably provide the jury with relevant information to determine whether drug trafficking took place.

-38-

The Court concludes, except on the issue of traveling on a known drug route, that his opinions are reliable and are ones that the jury may properly consider.  Consequently, the Court will not exclude Hella's opinions under rule 702 and <u>Daubert v. Merrell Dow Pharmaceuticals</u>.  If the United States seeks to present expert testimony that traveling along I-40 qualifies as traveling on a known drug route, it must, either pretrial or before it presents such testimony at trial, lay a proper predicate for doing so outside the presence of the jury.

### III.   HELLA'S PROPOSED TESTIMONY DOES NOT VIOLATE RULE 704(b).

Furthermore, that Hella's proposed testimony bears on the Defendants' intent does not mean that it is improper expert testimony under rule 704(b).  Rule 704(b) provides: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  Fed. R. Evid. 704(b).  Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state.  <u>See</u> <u>United States v. Torres</u>, 53 F.3d at 1141-42.  In making such a determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.  <u>See</u> <u>United States v. Perkins</u>, 470 F.3d at 158.  The United States should instruct Hella that he should not phrase his testimony in terms of opining on the Defendants' mental states -- specifically whether they intentionally or knowingly were conspiring to distribute drugs. Specifically, he may not say that they knew there were drugs in the car.  He may testify about facts that support a conclusion that a drug conspiracy occurred and explain why those facts support a conclusion that drug trafficking took place.  He may testify about what he has seen in previous drug

cases.  He may not, however, testify that the Defendants intentionally or knowingly engaged in drug

trafficking based on the surrounding circumstances.  "Those matters are for the trier of fact alone."

Fed. R. Evid. 704(b).  While he can lay out the facts and his knowledge for the jury so that they may

infer that there was a drug conspiracy and that the Defendants must have known, he cannot say what

the jury must infer.  He must stop with the facts and his knowledge, and allow the jury to make their

own inferences.

## IV.   **HELLA'S PROPOSED TESTIMONY IS NOT IMPROPER PROFILE EVIDENCE.**

The Defendants argue that Hella's proposed evidence is improper profile evidence that the

Court should exclude.  The Tenth Circuit has described profile evidence as follows: "[A] profile is

simply an investigative technique.  It is nothing more than a listing of characteristics that in the

opinion of law enforcement officers are typical of a person engaged in a specific illegal activity."

United States v. Robinson, 978 F.2d at 1563.  "A more tailored definition was offered in Florida v.

Royer, 460 U.S. 491, 493 . . . (1983), where drug courier profile was described as an abstract of

characteristics found to be typical of persons transporting illegal drugs."  United States v. Robinson,

978 F.2d at 1563 (internal quotation marks omitted).  "Courts have condemned the use of profiles

as substantive evidence of guilt."  United States v. Robinson, 978 F.2d at 1563.  The Tenth Circuit

has explained the difference between profile evidence and evidence that the prosecution may

circumstantially use to prove criminal activity:

> We decline to classify the testimony offered in this case as mere "profile"
> evidence.  Courts which have dealt with the issue effectively decided that the
> characteristics that make up the profile were indicators of a specific illegal activity,
> most usually the transportation of drugs.  Generally, profiles are used to detect crime,
> before the police have investigated or gathered evidence.  Conversely, here, the
> alleged profile characteristics did not necessarily indicate, nor did the expert equate
> the characteristics to, a specific criminal activity.  Rather, the expert testified that
> these particular items and clues lead him to the conclusion that the defendants were
> gang members.  This evidence was used after the investigation was complete to

-40-

explain the items found in the possession of the defendants.  The prosecution was later able to connect gang membership to the uncontroverted evidence that the main purpose of the Crips[7] was to traffic in crack cocaine.

United States v. Robinson, 978 F.2d at 1563.  The Tenth Circuit has emphasized that there must but

"other evidence showing guilt" to support a conviction rather than just "profile evidence."  United

States v. McDonald, 933 F.2d at 1521.  Profile evidence is distinguishable from proper evidence

regarding the modus operandi or tools of the trade of drug organizations largely based on "whether

a juror would be able to understand the evidence without specialized knowledge concerning the

subject":

> Rather than focusing our inquiry upon defining and classifying evidence into categories of profile or non-profile, we believe the better approach is to commence our inquiry with an examination of the applicable rules of evidence.  Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized

---

[7]Wikipedia states the following about the Crips:

> The Crips are a primarily, but not exclusively, African-American gang.  They were founded in Los Angeles, California, in 1969 mainly by Raymond Washington and Stanley Williams.  What was once a single alliance between two autonomous gangs is now a loosely connected network of individual sets, often engaged in open warfare with one another.

> The Crips are one of the largest and most violent associations of street gangs in the United States, with an estimated 30,000 to 35,000 members.  The gang is known to be involved in murders, robberies, and drug dealing, among many other criminal pursuits.  The gang is known for its gang members' use of the color blue in their clothing.  However, this practice has waned due to police crackdowns on gang members.

> Crips are publicly known to have an intense and bitter rivalry with the Bloods and lesser feuds with some Chicano gangs.  Crips have been documented in the U.S. military, found in bases in the United States and abroad.

Crips, Wikipedia, http://en.wikipedia.org/wiki/Crips (last visited August 2, 2012)(emphasis omitted)(footnote omitted).

knowledge concerning the subject.

In the case before us the evidence was specialized. Defendant possessed 6.7 grams of rock cocaine. A person possessing no knowledge of the drug world would find the importance of this fact impossible to understand. The average juror would not know whether this quantity is a mere trace, or sufficient to pollute 1,000 people.

The next items of evidence can best be described as a drug dealer's tools of trade: a single-edge razor blade, a pager or beeper, and a loaded pistol. Is the possession of these items something the jury can understand without the benefit of specialized knowledge?

We observe the razor blade is at least circumstantial evidence suggesting Defendant possessed the means to cut the rock cocaine and thus intended to distribute. The possession of the remaining tools of the trade, the pager and the loaded pistol, are likewise circumstantial evidence. The proper inquiry concerning expert evidence is simply whether the jury is able to understand the evidence without the specialized knowledge that is available from the testimony of an expert witness.

The $990 cash and $20 in food stamps were the next items of evidence to be considered. Why would someone have such a large quantity of money and food stamps upon his person? Without understanding the drug trade is a cash-and-carry business, and that both cash and food stamps are the medium of exchange in a drug transaction, the basic evidence would leave a juror puzzled. A jury could not understand the significance of this evidence without the particular background knowledge of how a drug dealer works.

These are not subjects with which most jurors are familiar.

United States v. McDonald, 933 F.2d at 1522 (footnotes omitted).

Profile evidence is primarily a concern when a court is reviewing Fourth Amendment issues and deciding whether the police's actions complied with the Fourth Amendment. See United States v. McDonald, 933 F.2d at 1521 ("The common use of profile evidence is to make investigative stops. Courts have frequently upheld investigative stops based upon profile characteristics."). Hella was not the arresting officer, and his testimony falls within the category of "evidence . . . used after the investigation was complete to explain the items found in the possession of the defendants" and to connect them to criminal activity. United States v. Robinson, 978 F.2d at 1563. Furthermore,

the Court has already held that the proposed expert testimony would be helpful to the jury, because the matters Hella will discuss are generally outside a given juror's common knowledge. Thus, the proposed testimony is not excludable on the basis that it is profile evidence. See United States v. McDonald, 933 F.2d at 1522. The United States should instruct Hella, however, not to use the word profile to avoid the issue of profile evidence such that the jury would think about that issue.

## V.      THE COURT WILL NOT EXCLUDE THE EVIDENCE UNDER RULE 403.

The Defendants argue that the Court should exclude Hella's testimony under rule 403 in light of the potential for misleading the jury, the risk of unfair prejudice, and the risk of confusion of issues. See Motion in Limine at 15-16. They note that the issue of drugs is politically charged and can also evoke emotional responses in jurors. See Motion in Limine at 15-16.

Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d at 1375. "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d at 638. The Tenth Circuit has recently reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787. Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d at 951. Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 543 F.3d at 1301. Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 453 F.3d at 1301.

The Court will not exclude this evidence under rule 403. As the Court has already discussed, the proposed expert testimony will be helpful to the jury, because the jury will not necessarily be familiar with the nuances of drug organizations. The matters on which Hella will testify all relate to the modus operandi of drug organizations and the tools of the narcotics trade, areas which the Tenth Circuit has recognized may require expert assistance to aid the jury. See United States v. McDonald, 933 F.2d at 1522. Accord United States v. Solorio-Tafolla, 324 F.3d at 966 ("It is well within the discretion of a district court 'to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar.'"). These matters meet the minimum threshold for relevancy under rule 401. Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 401 contains a low threshold for relevance, because "[a]ny more stringent requirement is unworkable and unrealistic." Fed. R. Evid. 401 advisory committee's note. Furthermore, given jurors' unfamiliarity with this subject matter, excluding the evidence would create as much or more of a chance of confusing the jurors. The Tenth Circuit has recently reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787. Furthermore, the Tenth Circuit has acknowledged that circumstantial evidence is one of the best methods of proving a conspiracy. United States v. Robinson, 978 F.2d at 1562 ("Circumstantial evidence is often the strongest evidence of conspiracy."). As the Tenth Circuit has stated: "Circumstantial evidence is often the strongest evidence of conspiracy." United States v. Robinson, 978 F.2d 1554, 1562 (10th Cir. 1992). As both the Supreme Court and the Tenth Circuit have recognized, an individual's

"knowledge must almost always be proved . . . by circumstantial evidence." United States v. Santos, 553 U.S. at 521.  Accord United States v. Wright, 412 F.App'x at 56 ("Intent to distribute may be inferred from circumstantial evidence, including a large drug quantity.").  In fact, the Tenth Circuit has characterized evidence of tools of the trade as circumstantial evidence.  United States v. McDonald, 933 F.2d at 1522 ("The possession of the remaining tools of the trade, the pager and the loaded pistol, are likewise circumstantial evidence.").  Consequently, the Court cannot say that the risk of confusion or misleading the jury substantially outweighs the evidence's probative value.

Furthermore, the Court does not see how excluding this evidence will take the issue of drugs off the table.  The Defendants assert that the issue of drugs is politically charged and can also evoke emotional responses in jurors.  See Motion in Limine at 15-16.  Given that the case is a prosecution for possession of methamphetamine, it is impossible to keep the jurors from knowing about drugs. Any controversy the discussion of drugs at trial may create is unavoidable.  Thus, the Court cannot say that the unfair prejudice of Hella's proposed testimony substantially outweighs its probative value.  Thus, the Court will not exclude Hella's testimony under rule 403.

**VI.  THE COURT WILL NOT EXCLUDE THE EVIDENCE UNDER CRIMINAL RULE 16.**

The Defendants also seek to exclude Hella's testimony on the basis that the expert Notice the United States provided is not sufficiently specific to satisfy rule 16(a)(1)(g).  "A defendant is entitled, under some circumstances, to request a written summary of expert testimony the United States intends to use in its case-in-chief."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1227. Rule 16 provides in relevant part:

> **Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  If the government requests discovery under subdivision

(b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition.  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  As Professor James Moore has stated: "It is not clear how much detail must be provided to satisfy this provision."  25 J. Moore, Moore's Federal Practice § 616.05[3], at 616-65 (3d ed. 2012).  The Seventh Circuit found the following summary of expert testimony sufficient, "although barely," when the government planned to present evidence regarding a drug courier profile:

> In response to your Request for Written Summary of the Government's Proposed Expert Testimony dated December 3, 1993, please be advised that Officers Emmit C. Carney, Jerry Cheung, and R.J. Kenney may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.  In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics.  Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations.

United States v. Jackson, 51 F.3d 646, 651 (7th Cir. 1995).  The Seventh Circuit elaborated that in "cases involving technical or scientific evidence," there may be a "greater disclosure" obligation, "including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed.R.Evid. 703."  United States v. Jackson, 51 F.3d at 651 (citing Fed. R. Crim. P. 16(a)(1)(E) advisory committee's note).

The Notice provides: "The United States anticipates that DEA special agent Ivar Hella will testify, inter alia, that the quantity of methamphetamine in question is a distributable amount, as opposed to a personal use amount."  Notice at 2.  The Notice states: "Special agent Hella will also quantify the monetary value of the seized methamphetamine.  It is anticipated that Special Agent Hella will offer testimony regarding general aspects of narcotics investigations."  Notice at 2.  The

United States relates that Hella's qualifications include: "He has been employed with DEA since 1998.  As an agent with the DEA, SA Hella has attended a 16 week academy . . . ."  Notice of 2.  The United States asserts that Hella then "was assigned to the wire intercept and long term conspiracy investigations group in Tucson, Arizona for approximately three and a half years."  Notice at 2.  The United States notes that "Hella has been involved with numerous narcotics smuggling and distribution investigations which have resulted in the seizure of narcotics, the seizure of property, and the arrest, prosecution and conviction of the subjects of those investigations."  Notice at 2.  The United States relates that Hella "has personal knowledge of prices of narcotics in the Albuquerque, New Mexico area, as well as common means of packaging of various narcotics and concealment methods utilized by narcotic traffickers while transporting narcotics.  Notice at 2.  The United States represents that Hella "has extensive knowledge in debriefing defendants, co-conspirators, witnesses, and informants who have been involved in unlawful drug trafficking."  Notice at 2.  The United States asserts that individuals with experience like Hella has "often know about the monies exchanged and received for drugs, as well as the techniques and methods by which drug traffickers acquire, spend, convert, transport, distribute and conceal the proceeds they derive from unlawful drug trafficking."  Notice at 3.  The United States notes that "Hella's testimony will be based on his cumulative knowledge, experience, and training."  Notice at 3.

While the Court cannot say that the Notice is as specific as it could be, the Court does not believe that it is so deficient as to require a sanction.  The United States sets out the general subject matter of Hella's proposed testimony and his background.  It also sets out the basis for his testimony.  The Notice specifically relates that he will testify about drug value, that the evidence indicates the Defendants intended to distribute drugs, and narcotics investigations in general.  Furthermore, the United States is not seeking to have him testify on a complex scientific or technical

area, which may require greater disclosure.  See United States v. Jackson, 51 F.3d at 651.

Furthermore, even if a sanction were appropriate, the Defendants have not shown any prejudice in light of the extensive outline the United States gave regarding Hella's proposed testimony at the hearing on July 25, 2012.  See United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)("Frequently it will be found that the party who requested disclosure has not been prejudiced and that no sanction is needed.").  The Tenth Circuit has also stated: "We note that the sanction requested by Defendant -- exclusion of the witnesses' expert testimony -- is almost never imposed 'in the absence of a constitutional violation or statutory authority for such exclusion.'" United States v. Charley, 189 F.3d at 1262.  Additionally, given the explanation of the expected subject areas for Hella's testimony at the hearing on July 25, 2012, Goxcon-Chagal said he had sufficient notice of the proposed testimony such that he no longer had problems with the Notice. See Tr. at 25:1-15 (Court, Gandert).

**IT IS ORDERED** that the Motion in Limine to Exclude Unqualified Expert Testimony, filed April 23, 2012 (Doc. 55), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Jon K. Stanford
Raul Torrez
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Joseph W. Gandert
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorneys for Defendant Rafael Goxcon-Chagal*

Joseph Riggs
Albuquerque, New Mexico

    *Attorney for Defendant Maria Vianey Medina-Copete*