IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                  No. CR 11-2002 JB

RAFAEL GOXCON-CHAGAL,
and MARIA VIANEY MEDINA-COPETE,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendants' Motion in Limine to Exclude

Unqualified Expert Testimony II, filed July 16, 2012 (Doc. 73)("Motion in Limine").  The Court

held hearings on July 25 and July 30, 2012.  The primary issues are: (i) whether United States

Marshal Robert Almonte, the United States Marshall for the Western District of Texas, is qualified

to present expert testimony on whether Santa Muerte[1] materials are tools of the trade of drug

---

[1]Wikipedia provides the following description of Santa Muerte: "Santa Muerte is a sacred figure venerated primarily in Mexico and the United States, probably a syncretism between Mesoamerican and Catholic beliefs.  The name literally translates to 'Holy Death' or 'Saint Death.'" Santa Muerte, Wikipedia, http://en.wikipedia.org/wiki/Santa_Muerte (last visited August 3, 2012). Wikipedia also states the following about Santa Muerte:

       Santa Muerte generally appears as a skeletal figure, clad in a long robe and carrying one or more objects, usually a scythe and a globe.  The robe is most often white, but images of the figure vary widely from person to person and according to the rite being performed or the petition of the devotee.  As the worship of Santa Muerte was clandestine until recently, most prayers and other rites are done privately in the home.  However, for the past ten years or so, worship has become more public, especially in Mexico City.  The worship is mainly condemned by the Catholic Church in Mexico, but not by the Church world-wide under the aegis of the Pope, (or the Vatican of which he heads) and it is firmly entrenched among Mexico's lower working classes and various levels of the criminal world.  The number of believers in Santa Muerte has grown over the past ten to twenty years, to approximately two million followers at least and has crossed the border into Mexican American

traffickers; (ii) whether Almonte's expert testimony would be helpful to the finder of fact; (iii) whether Almonte's proposed expert testimony is sufficiently reliable for the Court to permit him to testify before a jury; (iv) whether Almonte's proposed testimony is improper profile evidence; (v) whether the Court should exclude the evidence under the First Amendment to the United States Constitution; (vi) whether the Court should exclude Almonte's testimony under rule 403 of the Federal Rules of Evidence; and (vii) whether the Court should exclude Almonte's testimony on the basis that Plaintiff United States of America has not provided sufficient information regarding his proposed testimony in its notice under rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure. The Court will deny the Motion in Limine.  Almonte is sufficiently qualified to give an expert opinion based on his training, experience, and skill.  Almonte's testimony about the tools of the trade of drug organizations as they relate to individuals who worship Santa Muerte would be helpful to the jury.  Almonte's proposed expert testimony is sufficiently reliable for the Court to permit him to testify before a jury.  Almonte's proposed testimony is not improper profile evidence.  Neither the First Amendment to the United States Constitution's Establishment Clause nor the Free Exercise Clause require exclusion of this evidence.  Because the risk of unfair prejudice does not substantially outweigh the probative value of Almonte's testimony, the Court will not exclude his testimony under rule 403.  Lastly, the Court finds that the United States' notice under rule 16(a)(1)(E), with the additional disclosures at the two hearings, is sufficient to comply with that rule.

## FACTUAL BACKGROUND

The Court recites the basic allegations of the case as stated in an affidavit attached to the

_____

communities in the United States.

Santa Muerte, supra.

Criminal Complaint, filed June 29, 2011 (Doc. 1).  "On June 28, 2011, . . . New Mexico State Police Sergeant Arsenio Chavez was on patrol on Interstate 40 near the 134 mile marker traveling westbound."  Affidavit of Ivar Hella at 2 (executed June 29, 2011), filed June 29, 2011 (Doc. 1)("Hella Aff.").  "Chavez observed a gray Chevrolet pickup traveling too closely behind a UPS Commercial Motor vehicle."  Hella Aff. at 2.  "Chavez pulled up behind the vehicle, engaged his emergency equipment, and initiated a traffic stop."  Hella Aff. at 2.  "After making contact with the driver," Defendant Rafael Goxcon-Chagal, Chavez asked Goxcon-Chagal for his identification. Hella Aff. at 2.  Goxcon-Chagal "appeared as if he did not know where the documentation was in the vehicle and fumbled through the contents of the center console then the glove box."  Hella Aff. at 2.  Goxcon-Chagal "provided an Oklahoma driver's license with an address in Tulsa, Ok."  Hella Aff. at 2.  Goxcon-Chagal had a "Nevada license plate" on the vehicle he was driving.  Hella Aff. at 2.  "The registration indicated the owner of the vehicle was Julio Lopez with an address in Las Vegas, Nevada along with recently purchased insurance."  Hella Aff. at 2.  While Goxcon-Chagal "was looking for the documents, Sgt. Chavez noted the following: strong chemical odor emanating from the vehicle, air freshener hanging from rear view mirror," and Goxcon-Chagal "seemed not to know exactly where the documents were located in the vehicle."  Hella Aff. at 2.

Goxcon-Chagal informed the officer that he "was en route to Oklahoma from Las Vegas, Nevada where he has been working."  Hella Aff. at 2.  Goxcon-Chagal "advised he was traveling back to Oklahoma for a ten-day vacation."  Hella Aff. at 2.  "He identified the passenger," Defendant Maria Vianey Medina-Copete, "as his wife."  Hella Aff. at 2.  Goxcon-Chagal "had a hard time identifying the owner of the vehicle and all he could say was the owner was a friend of his in Nevada."  Hella Aff. at 2.  Goxcon-Chagal and Medina-Copete eventually consented to a search of the vehicle.  See Hella Aff. at 3-4.  "K-9 Marco, who is trained and certified to detect"

various drug odors, "was deployed by Sgt. Chavez and subsequently alerted both to the exterior and interior of the vehicle."  Hella Aff. at 4.  "A follow-up hand search by Sgt. Chavez located a false compartment behind the passenger side air bag."  Hella Aff. at 4.  "Upon removing the airbag a plastic piece which had been affixed to the airbag compartment was removed and revealed two packages of white glass-like substances which appeared to be methamphetamine."  Hella Aff. at 4.  "The total weight of both packages was approximately 1003.4 grams."  Hella Aff. at 4.  The United States also alleges that "officers recovered a Santa Muerte statute and a document from the vehicle that contained a Santa Muerte prayer."  Response to Motion in Limine to Exclude Expert Testimony II at 5, filed July 23, 2012 (Doc. 75)("Response").

## PROCEDURAL BACKGROUND

On May 10, 2012, the United States filed its United States' Notice of Intention to Offer Expert Testimony.  See Doc. 62 ("Notice").  The Notice provides that the United States will offer Almonte as an expert witness "regarding the use of 'patron saints' by drug traffickers, with specific attention towards Santa Muerte, and how Santa Muerte prayers and icons are 'tools of the trade' for many drug traffickers."  Notice at 1.  The Notice relates that "Marshal Almonte has over 25 years of combined state and federal law enforcement experience, much of it devoted to narcotics enforcement."  Notice at 1.  "He currently serves as the United States Marshal for the Western District of Texas, which encompasses San Antonio and El Paso."  Notice at 1.  The United States asserts that "Marshal Almonte has studied various patron saints throughout Mexico for many years."  Notice at 1-2.  The United States represents:

> His experience in this area, comprising hundreds, if not thousands of hours of study, has led Marshal Almonte to create and produce a law enforcement training video; "Patron Saints of the Mexican Drug Underworld," and he is currently writing a book on this topic.  Marshal Almonte has trained several thousand law enforcement officers on this topic throughout the United States over the last seven years.  Marshal

-4-

Almonte has been previously qualified as an expert in federal court on this topic, including at least one such instance in the District of New Mexico. Marshal Almonte's expert testimony, specifically regarding Santa Muerte, has been previously accepted by the district court for the Western District of Texas as admissible evidence. See United States v. Javier Guererro, et al., Criminal No. 09-820 AM, Doc. 454;. [sic] Marshal Almonte's biography and curriculum vitae is attached.

Notice at 2.

Almonte's curriculum vitae notes that he: (i) worked for the El Paso, Texas Police Department from 1978 to 2003; (ii) served as an instructor for both general police training and drug enforcement training in various capacities from 1990 to 2007; (iii) worked, in the private sector, as a law enforcement trainer and consultant from 2004 to 2010; (iv) served as the executive director of the Texas Narcotic Officers Association from 2006 to 2010; and (v) has served as the United States Marshal for the Western District of Texas since 2010. See Curriculum Vitae of Robert R. Almonte at 1, filed May 10, 2012 (Doc. 62-1)("Curriculum Vitae"). His Curriculum Vitae notes that he received a bachelor of science degree, summa cum laude, in Criminal Justice Administration from Park University. See Curriculum Vitae at 1. Almonte has published two books: (i) Evolution of Narcotics Investigations in 2004; and (ii) Managing Covert Operations in 2004. See Curriculum Vitae at 1. He has developed a law enforcement training video entitled Patron Saints of the Mexican Drug Underworld. See Curriculum Vitae at 1. He has testified in three federal cases, all in 2011, on the topic of Santa Muerte. See Curriculum Vitae at 1-2. Almonte relates that he has the following research interests:

> While working as a narcotics detective, I learned that Mexican drug traffickers were praying for protection from law enforcement. They prayed to various religious icons and many of these traffickers also utilized an advisor known as a "curandero" for guidance and to perform "blessings" on themselves as well as their drug loads. In 2003, I began conducting extensive research on how the Mexican drug traffickers involve the spiritual world in their activity. Mexican drug traffickers pray to various recognized and non-recognized religious icons that are known as their "patron

saints".  These "patron saints" or icons include; Jesus Malverde, Santa Muerte, San Simon, Juan Soldado, St. Jude, The Virgin of Guadalupe, San Ramon, San Toribio Romo, Nino de Atocha and others.  I have visited several shrines of their patron saints throughout Mexico, Spain, and the United States.  I have compiled several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity.  I created and produced a law enforcement training video; "Patron Saints of the Mexican Drug Underworld", and I am currently writing a book on this topic.  Over the last seven years, I have conducted training throughout the United States for several thousand law enforcement officers.  I have testified in federal and state court concerning various icons.

Curriculum Vitae at 2.  He has spoken as a lecturer or provided presentations for over fifty-five different state and federal law enforcement organizations.  See Curriculum Vitae at 3-4.

On July 16, 2012, the Defendants filed their Motion in Limine.  See Doc. 73.  They argue that Almonte "is not qualified to render an expert opinion regarding patron saints of drug traffickers."  Motion in Limine at 6.  They assert that Almonte's opinions are unreliable, and that the Court should exclude that evidence under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993),[2] and rule 702 of the Federal Rules of Evidence.  See Motion in Limine at 6.  They argue:

> The proposed testimony of United States Marshal Robert Almonte does not pass these requirements.  The prosecution has provided no information about the agent's methodology or the data on which he intends to base his testimony.  The prosecution provides only the agent's general qualifications as a law enforcement officer.  Under such conditions, admission of the testimony would be clear error.

Motion in Limine at 8.  The Defendants contend that "[t]he sole purpose of United States Marshal Robert Almonte's expert testimony and self-serving testimony regarding patron saints of drug traffickers is solely to bolster the prosecution's case by the use of his self-proclaimed expert theories that the defendants are guilty."  Motion in Limine at 6.  They argue that the expert testimony is

_____

[2]In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court of the United States held that the Federal Rules of Evidence assign to the trial judge the task of ensuring that scientific evidence is sufficiently reliable such that it will assist a trier of fact.  See 509 U.S. at 592-94.

"irrelevant."  Motion in Limine at 8.  The Defendants assert that the proposed expert testimony "would not assist the jury in fairly discerning the facts of this case, as required by Rule 702." Motion in Limine at 9.  They also contend that the Court should exclude the evidence under rule 403, because the testimony is "overly prejudicial" and "would have minimal, if any, probative value."  Motion in Limine at 9.  They argue that the evidence is improper "profile evidence, which is inadmissible as substantive proof."  Motion in Limine at 10.  They assert that Almonte's proposed testimony "amounts to little more than telling the jury what conclusion to reach."  Motion in Limine at 11.  The Defendants contend that the United States' Notice is deficient under rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure "based on the sparse information the prosecution has proffered regarding United States Marshal Robert Almonte's testimony."  Motion in Limine at 13-14.

On July 23, 2012, the United States filed its Response to the Motion in Limine.  See Doc. 75.  The United States asserts that "Santa Muerte is not a saint, and the Catholic church does not recognize it as such."  Response at 7 (emphasis in original).  The United States refers to Santa Muerte and other saints it asserts are important in the drug trafficking community as "narco-saint[s]."  Response at 7.  The United States represents that it "plans to introduce, through its own expert, that Santa Muerte is also revered by many law-abiding people, and the presence of Santa Muerte paraphernalia, without more, does not automatically mean somebody is involved in drug trafficking."  Response at 7.  The United States relates that it will not, "as Defendants suggest, introduce testimony regarding Santa Muerte as profile evidence, but rather as a common tool of the drug trade."  Response at 7.  The United States asserts that it "will establish, through its expert, that many drug traffickers, particularly couriers, pray to Santa Muerte for protection from law enforcement and prosperity in their drug dealing."  Response at 7-8.  The United States notes that,

like "many, many, other items," possession of materials relating to Santa Muerte may be "perfectly legal, but can [also] be used illegitimately in a drug trafficking scheme." Response at 8. It gives as examples "otherwise innocuous scales, glass pipes, and plastic baggies." Response at 8 (citing United States v. Triana, 477 F.3d 1189, 1195 (10th Cir. 2007)). The United States asserts that the Defendants "gloss[] over [Almonte's] extensive experience and research regarding Santa Muerte and other patron saints in the drug smuggling context," and improperly shift the focus to "whether his experience and research has been subject to peer review." Response at 8.

The United States notes that "Almonte's testimony regarding Santa Muerte has been previously accepted by the district court for the Western District of Texas as admissible." Response at 9 (citing United States v. Javier Guererro, No. DR-09-CR-820(1, 5)-AM, Order at 1-6 (W.D. Tex. May 10, 2011), filed July 23, 2012 (Doc. 75-1)("Guererro Opinion")). The United States notes that the United States District Court for the Western District of Texas "found that Marshal Almonte had invested thousands of hours of research on this topic, and lectured on the precise subject at hundreds of law enforcement seminars across the country." Response at 9 (citing Guererro Opinion at 3). The United States relates that the Western District of Texas found that Almonte "'is treated as a Santa Muerte expert among the law enforcement community' [and] qualified him as an expert, despite the defendants' challenge that his methodology had not been subjected to peer review." Response at 9 (quoting Guererro Opinion at 4). The United States notes that the United States Court of Appeals for the Tenth Circuit has addressed similar matters and has referred to Jesus Malverde[3]

---

[3]Wikipedia provides the following description of Jesus Malverde:

   Jesús Malverde, sometimes known as the "generous bandit", "angel of the poor", or the "narco-saint", is a folklore hero in the Mexican state of Sinaloa. He is celebrated as a folk saint by some in Mexico and the United States, particularly among those involved in drug trafficking, He is not recognized as a saint by the

as a saint who "is considered a patron saint by some drug traffickers."  Response at 9 (quoting

United States v. Lopez-Gutierrez, 334 F.App'x 880 (10th Cir. 2009)(unpublished)).  The United

States asserts that the Court has also referred to Jesus Malverde as "widely known as the patron saint

of drug dealers, or the 'narco saint.'" Response at 9 (quoting United States v. Pena-Macedo, No. 07-

1336, 2008 WL 3992135 (D.N.M. Apr. 28, 2008)(Browning, J.)).[4]  The United States argues that

the United States Court of Appeals for the Eighth Circuit "has recognized that Santa Muerte is

'commonly used by drug traffickers for protection.'"  Response at 10 (quoting United States v.

Pena-Ponce, 588 F.3d 579, 582 (8th Cir. 2009)).  The United States represents that Almonte "will

testify that both Santa Muerte and Jesus Malverde are narco-saints, and are used in the same manner

---

Roman Catholic Church.

Jesús Malverde, Wikipedia, http://en.wikipedia.org/wiki/Jes%C3%BAs_Malverde (last visited August 3, 2012)(footnotes omitted).  Wikipedia provides the following information about Jesus Malverde's history:

> The existence of Malverde a.k.a. 'El Rey de Sinaloa' is not historically verified, but according to local legends he was a bandit killed by the authorities on May 3, 1909.  Accounts of his life vary -- sometimes he was a railway worker, while others claim he was a construction worker.  There is also no agreement on the way he died, being hanged or shot.

> Since Malverde's supposed death, he has earned a Robin Hood-type image, making him popular among Sinaloa's poor highland residents.  The outlaw image has caused him to be adopted as the "patron saint" of the region's illegal drug trade, and the press have thus dubbed him "the narco-saint."  However, his intercession is also sought by those with troubles of various kinds, and a number of supposed miracles have been locally attributed to him, including personal healings and blessings.

Jesús Malverde, supra.

[4]The Court's opinion in United States v. Pena-Macedo was an opinion on a sentencing matter that recounted in the procedural background that "[t]he United States contends that among Pena-Macedo's possessions was an image of Jesus Malverde, widely known as the patron saint of drug dealers, or the 'narco saint.'"  2008 WL 3992135, at *2.

as tools of the trade by drug traffickers."  Response at 10.  The United States notes that the
Honorable William P. Johnson, United States District Judge for the District of New Mexico, has
found Almonte to be a sufficiently qualified expert on this issue and that his opinions regarding
Jesus Malverde were sufficiently reliable.  See Response at 10 (quoting United States v. Bobadilla-
Campos, 839 F.Supp.2d 1230, 1235, 1237-38 (D.N.M. 2012)(Johnson, J.)).  The United States
asserts that courts have recognized that any harmful effect from the admission of this testimony is
avoidable if Almonte brings out that many law-abiding individuals honor Santa Muerte and Jesus
Malverde.  See Response at 11.  The United States contends that "a jury is unlikely to understand
the significance of such evidence absent such testimony."  Response at 12.

At the hearing on July 25, 2012, the parties stated that they would prefer to have a separate
hearing on the Motion in Limine regarding Santa Muerte but provided some arguments on the
motion.  The Defendants stated that, if the Court will allow Almonte's expert testimony regarding
Santa Muerte, they may need their own expert to rebut his testimony.  See Transcript of Hearing at
37:19-25 (taken July 25, 2012)(Riggs)("July 25, 2012 Tr.").[5]  The Defendants related that they have
been looking for an expert for several months but have been unable to find one.  See July 25, 2012
Tr. at 38:25-39:5 (Riggs).  Goxcon-Chagal asserted that the evidence goes only towards his co-
defendant.  See July 25, 2012 Tr. at 39:13-22 (Gandert).  The Defendants also asserted that
presenting this evidence implicates freedom of religion.  See July 25, 2012 Tr. at 39:13-40:7
(Gandert).  The United States related that it is not necessary to use the word profile.  See Tr. at
26:24-25 (Torrez).  The United States noted that Almonte is still in the process of writing a book on
narco saints.  See Tr. at 45:23-25 (Stanford).  The United States informed the Court that it would

_____

[5]The Court's citations to the transcripts of the hearings refer to the court reporter's original,
unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

provide a copy of the law enforcement training video Almonte has developed to the Defendants within twenty-four hours.  <u>See</u> Tr. at 45:18-20 (Stanford).  The Defendants argued that it is necessary to distinguish between Jesus Malverde and Santa Muerte, because Jesus Malverde has a closer association with narcotics trafficking.  <u>See</u> July 25, 2012 Tr. at 47:22-49:1 (Court, Gandert). The United States emphasized that these subtle considerations make this topic a better one to have an expert flesh out for the jury.  <u>See</u> July 25, 2012 Tr. at 49:4-50:1 (Stanford).

At the hearing on July 30, 2012, the parties reiterated many of the same arguments they raised at the hearing on July 25, 2012.  The Defendants emphasized that the cases on which the United States relies are distinguishable on the basis that this case involves one main issue -- whether the Defendants knew they were transporting drugs.  <u>See</u> Transcript of Hearing at 3:18-4:2 (taken July 30, 2012)(Riggs)("July 30, 2012 Tr.").  The Defendants noted that they are willing to stipulate to many issues in the case.  <u>See</u> July 30, 2012 Tr. at 4:10-20 (Riggs).  They assert that various terms, such as narco saint and tools of the trade, are objectionable on the basis that they invade the province of the jury.  <u>See</u> July 30, 2012 Tr. at 6:25-8:2 (Riggs).  The Defendants argued that injecting religion into the case implicates a variety of concerns.  <u>See</u> July 30, 2012 Tr. at 8:3-7 (Riggs).  The Defendants noted that, while Almonte has an impressive resume, his experience is only on the law enforcement side.  <u>See</u> July 30, 2012 Tr. at 8:14-23 (Riggs).  The Defendants assert that there are additional concerns about the reliability of Almonte's proposed testimony given that there are so few experts in this field.  <u>See</u> July 30, 2012 Tr. at 8:24-9:16 (Riggs).  Goxcon-Chagal emphasized that the evidence relates only to his co-defendant.  <u>See</u> July 30, 2012 Tr. at 14:21-23 (Gandert).  The United States reiterated that it planned to have Almonte testify that a significant number of law-abiding citizens also worship Santa Muerte.  <u>See</u> July 30, 2012 Tr. at 15:6-14 (Stanford).  The Defendants acknowledged that the Catholic faith has not recognized Santa Muerte as a saint.  <u>See</u>

July 30, 2012 Tr. at 15:15-17 (Gandert).  They elaborated that Santa Muerte still has religious meaning even if the Catholic faith does not recognize Santa Muerte as a saint.  See July 30, 2012 Tr. at 15:15-16:2 (Gandert).

The Court related that, although rule 610 bars evidence of a witness' religious beliefs for credibility purposes, the Court is not aware of any authority construing that rule to include matters such as evidence offered to prove intent to commit a crime.  See July 30, 2012 Tr. at 16:3-15 (Court).  The Court stated that the limitations stated in rule 610 are such that it likely does not conflict with the First Amendment.  See July 30, 2012 Tr. at 16:3-15 (Court).  The Defendants emphasized that the evidence is unfairly prejudicial in light of its low probative value and that presenting the evidence would encroach on their religious freedom.  See July 30, 2012 Tr. at 16:16-18:4 (Gandert).  The United States analogized to a case where a defendant killed an individual to sacrifice the person for religious purposes and related that evidence like that Almonte intends to present helps elucidate a defendant's intentions.  See July 30, 2012 Tr. at 18:21-19:10 (Stanford).  The United States emphasized that this evidence does not mean that the Defendants are automatically guilty of drug trafficking, but related that the jury should have the evidence before it to more fully understand the context behind the Defendants' actions.  See July 30, 2012 Tr. at 19:11-22 (Stanford).  The United States also asserted that it is inaccurate to describe Almonte as the only expert on this topic, given that an online computer search can reveal several others who are qualified to testify on these matters.  See July 30, 2012 Tr. at 19:23-20:6 (Stanford). The United States argued that, in every case where courts have admitted similar testimony, the underlying issue was whether the charged individuals were trafficking drugs.  See July 30, 2012 Tr. at 20:7-24 (Stanford).  The United States emphasized that the Defendants can easily resolve any improper inferences the jury might draw from the evidence through effective cross-examination.  See July 30, 2012 Tr. at 20:25-

21:7 (Stanford).  The United States related that it could instruct Almonte to avoid using the term narco saint.  <u>See</u> July 30, 2012 Tr. at 22:3-23:3 (Court, Stanford).  The United States asserted that the number of individuals who honor Santa Muerte outside of the drug-trafficking context is a matter that goes to the weight of the evidence rather than its reliability.  <u>See</u> July 30, 2012 Tr. at 23:17-25 (Court, Stanford).  The Defendants also proposed that Almonte not use the term drug trafficking. <u>See</u> July 30, 2012 Tr. at 26:9-13 (Gandert).  The Court stated that it was inclined to permit the evidence and to believe that the Defendants' arguments go towards the weight of the evidence.  <u>See</u> July 30, 2012 Tr. at 26:24-27:14 (Court).

## LAW REGARDING DRUG ORGANIZATION TESTIMONY

The Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology."  <u>United States v. Walker</u>, 179 F.App'x 503, 507 (10th Cir. 2006)(unpublished)(quoting <u>United States v. Quintana</u>, 70 F.3d 1167, 1171 (10th Cir. 1995)).   "This rule is based on the Tenth Circuit's recognition that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade 'are not subjects with which most jurors are familiar.'"  <u>United States v. Hernandez-Mejia</u>, No. 05-0469, 2007 WL 2219411, at *4 (D.N.M. Apr. 30, 2007)(Browning, J.)(quoting <u>United States v. McDonald</u>, 933 F.2d 1519, 1522 (10th Cir. 1991)). Other Circuit Courts of Appeal are in accord.  <u>See</u> <u>United States v. Martinez</u>, 476 F.3d 961, 967 (D.C. Cir. 2007)("Expert testimony about the methods of drug organizations is common in drug cases."); <u>United States v. Robles-Rosas</u>, 27 F.App'x 897, 899 (9th Cir. 2001)(unpublished)(holding that the district court did not abuse its discretion in permitting testimony regarding the modus operandi of drug organizations); <u>United States v. Gastiaburo</u>, 16 F.3d 582, 589 (4th Cir. 1994)("[T]estimony on the modus operandi of criminals 'is commonly admitted,' particularly

regarding the methods of drug dealers."). More specifically, in cases involving possession with intent to distribute, the Tenth Circuit has held that "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue." United States v. Mundy, 97 F.App'x 844, 846 (10th Cir. 2004)(unpublished).

"Tools of the trade may necessitate the appearance of an expert witness if the jury could not understand the significance of the possession of those items." United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000). The Tenth Circuit has held that it was appropriate for the government to present evidence regarding "typical indica of drug trafficking activity" in a case where the government sought "to identify for the jury common red flags suggestive of an illicit pharmaceutical operation." United States v. Lovern, 590 F.3d 1095, 1102 (10th Cir. 2009). The Tenth Circuit has "upheld the admission of expert testimony detailing the significance of 'a drug dealer's tools of [the] trade: a single-edge razor blade, a pager or beeper, and a loaded pistol." United States v. Becker, 230 F.3d at 1231 (alteration in original). The Tenth Circuit has also upheld "the admission of expert testimony to 'explain[] the meaning of the physical evidence' officers 'found at the arrest scene . . . where the narcotics were confiscated." United States v. Becker, 230 F.3d at 1231. The Tenth Circuit found it permissible for an officer to testify "about the common features of drug transactions to assist the jury in understanding the nature of the drug business," including "that most drug organizations are closed and secretive and that it would be unusual for a person who was not otherwise involved in the operation to be present during the transaction." United States v. Wilson, 276 F.App'x 859, 860-61 (10th Cir. 2008)(unpublished). The United States Court of Appeals for the Fourth Circuit has recognized that a person may properly be qualified as an expert "in the field of investigative drug trafficking" in a given geographical area. United States v. Wilson, 484 F.3d 267, 273 (4th Cir. 2007).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." <u>United States v. Gutierrez-Castro</u>, 805 F.Supp.2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, whether the opinion testimony is the product of a reliable methodology." <u>United States v. Gutierrez-Castro</u>, 805 F.Supp.2d at 1224. "<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." <u>United States v. Gutierrez-Castro</u>, 805 F.Supp.2d at 1224.

  1.  **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").

-15-

An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.  See Morales v. E.D. Etnyre & Co., 382 F.Supp.2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).  Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

## 2.    The Standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district

court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)] (quoting Daubert, 509 U.S. at 589 . . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id. (quoting Daubert, 509 U.S. at 592 . . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court), and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591)).  If the expert's

proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris

v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, 526 U.S. 137

(1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharmaceuticals to

non-scientific expert testimony.  See 526 U.S. at 141 ("We conclude that Daubert's general holding

-- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony

based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized'

knowledge.").  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors

from Daubert v. Merrell Dow Pharmaceuticals will not apply to all cases:

> Our emphasis on the word may thus reflects Daubert's description of the Rule 702
> inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not
> constitute a definitive checklist or test.  And Daubert adds that the gatekeeping
> inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must

focus generally on "principles and methodologies, and not on the conclusions generated."  Armeanu

v. Bridgestone/Firestone N. Am., Tire, LLC, No. 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept.

26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this

focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may

conclude that there is simply too great an analytical gap between the data and the opinion proffered."

Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations

omitted)(internal quotation marks omitted).  The proponent of the expert's opinion testimony bears

the burden of establishing that the expert is qualified, that the methodology he or she uses to support

his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be

helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  As the Tenth Circuit

noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing
> reliability under Daubert, and because, in light of that discretion, there is not an
> extensive body of appellate case law defining the criteria for assessing scientific
> reliability, we are limited to determining whether the district court's application of
> the Daubert manifests a clear error of judgment or exceeds the bounds of permissible
> choice in the circumstances. . . . Thus, when coupled with this deferential standard
> of review, Daubert's effort to safeguard the reliability of science in the courtroom
> may produce a counter-intuitive effect: different courts relying on the essentially the
> same science may reach different results.

289 F.3d at 1206.  As the United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.
> However, scientists whose conviction about the ultimate conclusion of their research
> is so firm that they are willing to aver under oath that it is correct prior to performing
> the necessary validating tests could properly be viewed by the district court as
> lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503.

> Once reliability is established, however, it is still within the district court's discretion
> to determine whether expert testimony will be helpful to the trier of fact.  In making
> that determination, the court should consider, among other factors, the testimony's
> relevance, the jurors' common knowledge and experience, and whether the expert's
> testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. 05-1083, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning,

J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.  See

Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue

disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.

Therefore, there is no scientific basis for any expert testimony as to its specific presence in

Plaintiff."); In re Breast Implant Litig., 11 F.Supp.2d at 1228 ("An untested hypothesis cannot be

a scientifically reliable basis for an opinion on causation."). A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling  Drug, Inc., 19 F.Supp.2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans."). Courts have excluded experts' opinions when the experts depart from their own established standards. See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F.Supp.2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.    Necessity of Evaluating an Issue Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

The restrictions in Daubert v. Merrell Dow Pharmaceuticals apply to both "novel" expert testimony and "well-established propositions." 509 U.S. at 593 n.11 ("Although the Frye[6] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily

---

[6]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

defended." Daubert v. Merrell Dow Pharm., 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert v. Merrell Dow Pharm., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

## EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

(a)     **In General -- Not Automatically Objectionable.**   An opinion is not objectionable just because it embraces an ultimate issue.

(b)     **Exception.**  In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed. R. Evid. 704. "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, No. 05-0172, 2009 WL 3241555, at *10 (D.N.M. Aug. 25, 2009)(Browning, J.). "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 K. Broun, McCormick on Evidence § 12

(6th ed. 2006 update)).  The Federal Rules of Evidence reflect that the ultimate-issue rule has been

abolished.  See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998).  Although rule 704(a)

permits an expert to testify about areas that embrace an ultimate issue, there are some other

limitations, aside from those expressed in rule 704(b), regarding testimony on ultimate issues.  More

specifically, the Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by

applying the law to the facts." A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair

Cnty., Okla., 936 F.2d 472, 476 (10th Cir. 1991).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as

to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from

which the jury could conclude or infer that the defendant had the requisite mental state."  United

States v. Ganadonegro, No. 09-0312, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning,

J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)).  The restrictions in rule

704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir.

2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule

701, see Fed. R. Evid. 701(b).  "[Rules 701, 702, and 403] afford ample assurances against the

admission of opinions [under rule 704] which would merely tell the jury what result to reach,

somewhat in the manner of the oath-helpers of an earlier day."  United States v. Barile, 286 F.3d

749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the task of the courts "to distinguish [helpful]

opinion testimony that embraces an ultimate fact from [unhelpful] opinion testimony that states a

legal conclusion." United States v. Perkins, 470 F.3d at 158 (internal quotation marks omitted).  In

making that determination, a court should consider whether the question tracks the language of the

legal principle or statute at issue, and then consider whether any terms employed have a specialized

legal meaning.  See United States v. Perkins, 470 F.3d at 158.

## LAW REGARDING CRIMINAL RULE 16

"A defendant is entitled, under some circumstances, to request a written summary of expert testimony the United States intends to use in its case-in-chief."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1227.  Rule 16 provides in relevant part:

> **Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition.  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  Rule 16 similarly provides that a defendant must produce a summary of expert testimony under some circumstances:

> **Expert witnesses.** -- The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if --
>
> (i)     the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
>
> (ii)    the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.
>
> This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).

## LAW REGARDING RULE 610

Rule 610 provides: "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."  Fed. R. Evid. 610.  As a leading evidence treatise has

stated: "The rule [stated in rule 610] does not bar evidence that is offered to prove something other than the effect of the witness's religion on his or her credibility . . . . Evidence as to a defendant's religious affiliations was properly admitted when it established a possible motive in a criminal case." 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 610.03[2], at 610-4 to 610-5 (2d ed. 2012)(citing United States v. Hoffman, 806 F.2d 703, 708 (7th Cir. 1986)).   In United States v. Hoffman, the United States Court of Appeals for the Seventh Circuit addressed a district court's decision to admit evidence of a defendant's religious affiliation to establish "a possible motive for his sending the letter." United States v. Hoffman, 806 F.2d at 708.  The Seventh Circuit noted that the evidence of the defendant's religious affiliation "was probative of whether [he] intended the letter to constitute a 'true threat.'" United States v. Hoffman, 806 F.2d at 708.  The Seventh Circuit also stated that "the district court's thorough and extensive voir dire and the court's excusing of two jurors who might have been prejudiced against the defendant because of his religious affiliation" effectively removed "any possible prejudice that might have resulted from such evidence." United States v. Hoffman, 806 F.3d at 708.  The Seventh Circuit explained why admitting the evidence was proper:

> The district court record reveals that the evidence concerning Hoffman's religious beliefs was introduced to establish "the context of the statement (the letter) and the wilfulness of the defendant in making it."  Contrary to the assertion of the dissent, the government did not rely solely on the defendant's affiliation with Reverend Moon to establish the intent of Hoffman to threaten the President.  The government introduced additional evidence dealing with Hoffman's dissatisfaction with the continued confinement of Reverend Moon.  The government established this fact through testimony from Hoffman's mother, thus allowing the jury to reject or infer that Hoffman might very well have had a motive in threatening the President.  The law is eminently clear that the court may receive evidence as to the defendant's motive.  As the Fifth Circuit held in Reid v. United States, 136 F.2d 476 . . . (1943), where the government introduced evidence as to previous pro-German statements of the defendant: "[e]vidence as to appellant's pro-German attitude was relevant to the issue as to whether the statements against the President were knowingly and willfully made, and was admissible."  Id.  See also United States v. Patillo, 438 F.2d 13, 16

(4th Cir. 1971)(in prosecution under § 871 "trier of fact may . . . consider all relevant facts concerning the background of the defendant, his motives, the manner in which the threat was made, and the reaction of those who heard the threat and thus have an opportunity to form an opinion about the speaker's present intention to injure the President of the United States.")  Proof of motive is not required of the government under sec. 871, and is nothing more than an evidentiary aid to the jury in its fact-finding process of rendering a verdict of guilt or innocence.  Evidence of Hoffman's motive is probative of Hoffman's intent that his (Hoffman's) letter in fact constituted a "true threat" in the eyes of those who received the letter.  Hoffman's mother testified that "I think he (Hoffman) was concerned about many things.  One, that a religious leader had been imprisoned, and he thought that he's (Reverend Moon) highly principled, and he did not think this is right."  Hoffman's mother further testified that Hoffman believed that the Reverend Moon should have been pardoned by the President and released from confinement.  Obviously since Hoffman believed that Reverend Moon was wrongly imprisoned, and President Reagan could have pardoned him and thus was responsible for Moon's continued imprisonment, he had a motive to harm the President: retaliation.  The question of whether Hoffman had a motive to harm the President was presented to the jury with evidence from which they could reasonably accept or reject the inference that the defendant intended his threat to be taken as a serious threat to retaliate against the government (the President) for Reverend Moon's continued confinement.  The jury could reasonably conclude that Hoffman intended the violent language and the graphic drawing he used in his letter to the President as a serious expression of a true threat to inflict harm upon the President.  We hold that the probative value of the evidence of Hoffman's prior religious affiliation was not substantially outweighed by its alleged prejudicial impact and thus it was properly admitted in evidence.

United States v. Hoffman, 806 F.2d at 708-10.

The United States Court of Appeals for the Eleventh Circuit has stated: "A person's beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution."  United States v. Beasley, 72 F.3d 1518, 1527 (11th Cir. 1996).  The Eleventh Circuit explained:

It seems clear from the record that the Yahweh religion was not on trial.  The evidence regarding the religion was relevant, because religious teachings were used to justify, rationalize, and promote crime.  Appellants argue strenuously that the contested evidence violated Federal Rule of Evidence 610, which prohibits using religion to impeach a witness's credibility.  The appellants' argument is misguided.  The government agrees that it would have been improper to attack witnesses' credibility with their religious beliefs by suggesting that, because of those beliefs, their testimony was untrustworthy.  However, in this case, the government inquired

-25-

> into Yahweh practices and beliefs in an effort to show the background of the RICO enterprise, which the defendants used to carry out acts of murder and arson.  The evidence was relevant to show how Yahweh exerted influence and control over the members and how he used his preachings to justify heinous crimes.

United States v. Beasley, 72 F.3d 1518, 1527 (11th Cir. 1996).  In an unpublished decision, the United States Court of Appeals for the Sixth Circuit quoted approvingly the Eleventh Circuit's holding from United States v. Beasley.  See United States v. Shalom, 113 F.3d 1236, 1997 WL 225514, at *4 (6th Cir. 1997)(unpublished table decision)("Although we have not previously addressed the issue of error arising from a prosecutor's mention of a defendant's religious beliefs, we agree with the Eleventh Circuit's conclusion . . . .").  The United States Court of Appeals for the Second Circuit similarly concluded that it was proper for a district court to admit evidence regarding "Unification Church practices," because "it was inevitable" some of that evidence "would creep into the trial" given the central issue in the trial regarding the defendant's "control over the activities of other church officials."  Accord United States v. Sun Myung Moon, 718 F.2d 1210, 1233 (2d Cir. 1983)("The central issue for the jury to decide was whether the Tong I1 stock and Chase Manhattan Bank accounts belonged to the Church or to Moon personally.").  In the context of proposed voir dire questions, the Court has stated the following about rule 610 and the problems that come with permitting inquiry into religious matters in a case:

> Congress and the courts have been particularly sensitive to not introduce religious views unnecessarily into cases.  Rule 610 of the Federal Rules of Evidence prohibits a party [from attacking] the credibility of a witness because of his religious views or lack thereof: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."  If witnesses cannot be so challenged, the Court should be cautious about permitting the parties to question prospective jurors along similar lines.

> On the other hand, a defendant should be able, while remaining sensitive to undue intrusion into a prospective juror's religious beliefs, views, and practices, to inquire whether a juror has any view, religious or otherwise, that would preclude him

> from being a fair and impartial juror in this case.  If there is someone that is prejudiced for or against someone of a particular faith, the defendant should be able to detect that attitude.

United States v. Sandoval, No. 04-02362, 2006 WL 1304955, at *5 (D.N.M. Feb. 1, 2006)(Browning, J.).

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has recently reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  As the Supreme Court recently noted:

> In deference to a district court's familiarity with the details of the case and its greater

> experience in evidentiary matters, courts of appeals afford broad discretion to a
> district court's evidentiary rulings . . . . This is particularly true with respect to Rule
> 403 since it requires an "on-the-spot balancing of probative value and prejudice,
> potentially to exclude as unduly prejudicial some evidence that already has been
> found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 S. Childress & M.

Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)).  See United States v. Abel, 469

U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors

counseling against admissibility is a matter first for the district court's sound judgment under Rules

401 and 403 . . . .").

      Evidence may be unfairly prejudicial if it would likely provoke an emotional response from

the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.

See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999).  Evidence is not unfairly

prejudicial merely because it damages a party's case.  See United States v. Caraway, 543 F.3d 1290,

1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States

v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly prejudicial, the

evidence must have 'an undue tendency to suggest decision on an improper basis, commonly,

though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at 1301 (quoting

Fed. R. Evid. 403 advisory committee's note).

## ANALYSIS

      The Court will deny the Motion in Limine.  Almonte is sufficiently qualified to give an

expert opinion based on his training, experience, and skill.  Almonte's testimony about the tools of

the trade of drug organizations as they relate to individuals who worship Santa Muerte would be

helpful to the jury.  Almonte's proposed expert testimony is sufficiently reliable for the Court to

permit him to testify before a jury.  Almonte's proposed testimony is not improper profile evidence.

Neither the Establishment Clause nor the Free Exercise Clause require exclusion of this evidence. Because the risk of unfair prejudice does not substantially outweigh the probative value of Almonte's testimony, the Court will not exclude his testimony under rule 403.  Lastly, the Court finds that the United States' notice under rule 16(a)(1)(E), with the additional disclosures at the two hearings, is sufficient to comply with that rule.

## I.    ALMONTE IS QUALIFIED TO PROVIDE EXPERT TESTIMONY.

The Defendants contend that Almonte is not qualified to provide expert testimony.  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by 'knowledge, skill, experience, training, or education' and . . . the 'expert' . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d at 528.  The Tenth Circuit has stated that the modus operandi of drug organizations, the value of drug quantities, the language of narcotics dealers, and the tools of the narcotics trade "are not subjects with which most jurors are familiar," see United States v. McDonald, 933 F.2d at 1522, and that, more specifically, "testimony with regard to the significance of a quantity of drugs possessed is specialized knowledge that assists the jury in understanding a fact at issue," United States v. Mundy, 97 F.App'x at 846.

Because of the covert and unique nature of narcotics trafficking, Almonte's testimony will assist the jury to understand the evidence presented at trial.  See United States v. Walker, 179 F.App'x at 507 (recognizing that the Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology").  Almonte's proposed testimony is somewhat different from a typical case where a law enforcement officer seeks to testify on tools of the drug trade, such as the value of drugs or coded language for narcotics dealers.  Nevertheless, the Court cannot say that Almonte's proposed

testimony, specifically that the presence of Santa Muerte items in the Defendants' possession creates a stronger inference that they knew drugs were in the vehicle, would be unhelpful to the jury. The United States has related that Almonte will be forthright with the jury that not everyone who honors Santa Muerte has a connection to drug trafficking. Drawing the connection between a religious icon and drug trafficking is not a straightforward matter, and the Court cannot reasonably say that an expert's testimony would not be helpful to flesh out that matter. See United States v. Pena-Ponce, 588 F.3d at 584 (noting that the following matters constituted "suspicious circumstances: the passenger's excessive nervousness, conflicting stories about why the two had been in Lincoln, multiple cell phones in the truck, the passenger attempting to kick one out of sight, and the Santa Muerte figure"). As Judge Johnson from the District of New Mexico has stated:

> The Court rejects Defendant's contention that the subject of Marshal Almonte's opinion cannot be considered "tools of the trade" because some individuals who are not involved in drug trafficking also pray to Jesus Malverde. This contention plays neatly into the very reason why Jesus Malverde paraphernalia can be considered as "tools of the trade": these items are perfectly legal, and yet can be used illegitimately in a drug trafficking scheme.

United States v. Bobadilla-Campos, 839 F.Supp.2d at 1234 (emphasis in original). This matter relates to the tools of the narcotics trade, which the Tenth Circuit has recognized may require expert assistance to aid the jury. See United States v. McDonald, 933 F.2d at 1522. Accord United States v. Solorio-Tafolla, 324 F.3d 964, 966 (8th Cir. 2003)("It is well within the discretion of a district court 'to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar.'").

Furthermore, Almonte has extensive qualifications. Almonte's Curriculum Vitae notes that he: (i) worked for the El Paso, Texas Police Department from 1978 to 2003; (ii) served as an

instructor for both general police training and drug enforcement training in various capacities from 1990 to 2007; (iii) worked, in the private sector, as a law enforcement trainer and consultant from 2004 to 2010; (iv) served as the executive director of the Texas Narcotic Officers Association from 2006 to 2010; and (v) has served as the United States Marshal for the Western District of Texas since 2010.  See Curriculum Vitae at 1.  His Curriculum Vitae notes that he received a bachelor of science degree, summa cum laude, in Criminal Justice Administration from Park University.  See Curriculum Vitae at 1.  Almonte has published two books: (i) Evolution of Narcotics Investigations in 2004; and (ii) Managing Covert Operations in 2004.  See Curriculum Vitae at 1.  He has developed a law enforcement training video entitled Patron Saints of the Mexican Drug Underworld. See Curriculum Vitae at 1.  He has testified in three federal cases, all in 2011, on the topic of Santa Muerte.  See Curriculum Vitae at 1-2.  Almonte relates that he has the following research interests:

> While working as a narcotics detective, I learned that Mexican drug traffickers were praying for protection from law enforcement.  They prayed to various religious icons and many of these traffickers also utilized an advisor known as a "curandero" for guidance and to perform "blessings" on themselves as well as their drug loads.  In 2003, I began conducting extensive research on how the Mexican drug traffickers involve the spiritual world in their activity.  Mexican drug traffickers pray to various recognized and non-recognized religious icons that are known as their "patron saints".  These "patron saints" or icons include; Jesus Malverde, Santa Muerte, San Simon, Juan Soldado, St. Jude, The Virgin of Guadalupe, San Ramon, San Toribio Romo, Nino de Atocha and others.  I have visited several shrines of their patron saints throughout Mexico, Spain, and the United States.  I have compiled several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity.  I created and produced a law enforcement training video; "Patron Saints of the Mexican Drug Underworld", and I am currently writing a book on this topic.  Over the last seven years, I have conducted training throughout the United States for several thousand law enforcement officers.  I have testified in federal and state court concerning various icons.

Curriculum Vitae at 2.  He has spoken as a lecturer or provided presentations for over fifty-five different state and federal law enforcement organizations.  See Curriculum Vitae at 3-4.

Particularly in light of his numerous presentations, his publications, and his production of a law-enforcement training video on so-called narco saints, Almonte has considerable qualifications for a law enforcement officer.  A small number of law enforcement officers have similar qualifications.  Almonte has worked in law enforcement in border districts for over twenty years. He has provided training and consulting services to train law enforcement.  An expert may obtain qualifications through "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. The Court cannot reasonably conclude, in light of Almonte's extensive law-enforcement background, that he is unqualified.  Simply because Almonte has not worked with criminal defense organizations or had personal involvement in drug trafficking himself does not mean he is unqualified.  Those considerations go more towards the weight of his testimony rather than his qualifications.  Expert testimony is liberally admissible under the Federal Rules of Evidence.  See United States v. Gomez, 67 F.3d at 1526.  Thus, the Court concludes that Almonte is qualified to provide expert testimony.

## II.   ALMONTE'S EXPERT OPINION IS SUFFICIENTLY RELIABLE.

The Defendants argue that Almonte "is not qualified to render an expert opinion regarding patron saints of drug traffickers."  Motion in Limine at 6.  They assert that Almonte's opinions are unreliable, and that the Court should exclude that evidence under Daubert v. Merrell Dow Pharmaceuticals and rule 702 of the Federal Rules of Evidence.  See Motion in Limine at 6.  They argue:

> The proposed testimony of United States Marshal Robert Almonte does not pass these requirements.  The prosecution has provided no information about the agent's methodology or the data on which he intends to base his testimony.  The prosecution provides only the agent's general qualifications as a law enforcement officer.  Under such conditions, admission of the testimony would be clear error.

Motion in Limine at 8.  The Defendants contend that "[t]he sole purpose of United States Marshal

Robert Almonte's expert testimony and self-serving testimony regarding patron saints of drug traffickers is solely to bolster the prosecution's case by the use of his self-proclaimed expert theories that the defendants are guilty."  Motion in Limine at 6.

While many of the Tenth Circuit's precedent regarding expert testimony about the modus operandi and tools of the trade of drug organizations predate either <u>Daubert v. Merrell Dow Pharmaceuticals</u> or <u>Kumho Tire Co. v. Carmichael</u>, the decision that expanded the rules under <u>Daubert v. Merrell Dow Pharmaceuticals</u> to non-scientific expert testimony, the Tenth Circuit has reaffirmed those precedents in a 2009 decision:

> Mr. Garza's concern is the second requirement-reliability.  Officer Sanders's testimony was not reliable, he contends, because no conceivable "'science'" could illuminate "how an inanimate object such as a gun was or may be used."  Quoting Rule 702, he states that Sanders's "testimony had to be the product of 'reliable principles and methods' that were 'applied . . . reliably.'"  And he contends that "[u]nder <u>Daubert</u>, the methodology that must be employed is (1) whether the proffered theory can and has been tested; (2) whether the expert's opinion has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."

> We reject Mr. Garza's Rule 702 argument.  Officer Sanders's expert opinion was not improper simply because it was not scientific.  Rule 702 authorizes opinion testimony by experts with "scientific, technical, or other specialized knowledge."  That specialized knowledge can be acquired through "experience" and "training."  Moreover, although the trial judge must perform a gatekeeping role with respect to all expert testimony, not just such testimony by "scientific" experts, the reliability criteria enunciated in <u>Daubert</u> are not to be applied woodenly in all circumstances.  As the Supreme Court has explained, "[T]he factors identified in <u>Daubert</u> may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  (Although <u>Kumho Tire</u> predates the approval of the amendment to Rule 702 that added the three numbered conditions for admissibility, the amendment was intended to be fully consistent with <u>Kumho Tire</u>.)  Hence, it is not essential that Sanders's opinion be supported by the four factors taken by Mr. Garza from <u>Daubert</u>.  Accordingly, we do not believe that <u>Daubert</u> and its progeny (including the 2000 amendment to Rule 702) provide any ground for us to depart from our pre-<u>Daubert</u> precedents recognizing that police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters as the use of firearms in the drug trade.

United States v. Garza, 566 F.3d at 1198-1200 (alteration in original)(citations omitted).

The Tenth Circuit has found, as a general matter, that expert testimony regarding the modus operandi and tools of the trade of drug organizations withstands scrutiny under Daubert v. Merrell Dow Pharmaceuticals.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Furthermore, as the Supreme Court stated in Daubert v. Merrell Dow Pharmaceuticals, "well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  509 U.S. at 593 n.11.  "[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Almonte's proposed testimony, at least to some degree, falls in this latter category of cases, "where established methods are employed in new ways."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Accordingly, the Court will assess the reliability of his opinion.

It is worth noting that various courts have found the general proposition that the presence of personal items related to so-called narco saints can support a conclusion that a defendant was engaged in drug trafficking.  For instance, in rejecting an argument that an officer did not have reasonable suspicion of criminal activity such that he impermissibly conducted too lengthy of an investigative detention, the Eighth Circuit noted that the presence of a "Santa Muerte figure" was one of the "suspicious circumstances" that justified the investigative detention.  United States v. Pena-Ponce, 588 F.3d at 584 (noting that the following matters constituted "suspicious circumstances: the passenger's excessive nervousness, conflicting stories about why the two had

-34-

been in Lincoln, multiple cell phones in the truck, the passenger attempting to kick one out of sight, and the Santa Muerte figure"). Earlier in the opinion, the Eighth Circuit recited that the officer had testified at the suppression hearing that "a Santa Muerte statute . . . is commonly used by drug traffickers for protection." United States v. Pena-Ponce, 588 F.3d at 584. The Court has not located, and the parties have not directed the Court to, any other circuit court opinions providing further guidance on this matter as it relates to Santa Muerte.

Courts have reached similar conclusions regarding Jesus Malverde. In assessing whether it was "clearly improbable that . . . firearms were possessed during the commission of . . . drug offenses" in an appeal of a sentencing determination, the Sixth Circuit stated that the following circumstances supported a sentencing enhancement: "[O]fficers seized two handguns from the Honda, along with various pictures of Jesus Malverde, and a K-9 unit positively alerted twice to the Honda, suggesting that drugs had been in the vehicle." United States v. Caballero, 417 F.App'x 500, 507 (6th Cir. 2011)(unpublished). The Sixth Circuit, earlier in the opinion, referred to Jesus Malverde as "the 'patron saint' of drug traffickers." United States v. Caballero, 417 F.App'x at 502. The Tenth Circuit, in an unpublished decision, has similarly referred to Jesus Malverde as a saint who "is considered a patron saint by some drug traffickers." United States v. Lopez-Gutierrez, 334 F.App'x at 882. In an unpublished decision, the Ninth Circuit concluded that it was not plain error for a law enforcement officer to testify about the display of an image of Jesus Malverde, who the officer referred to as "the unofficial 'patron saint of narcotics traffickers.'" United States v. Uriarte-Acosta, 304 F.App'x 551, 554 (9th Cir. 2008)(unpublished). For that conclusion, the Ninth Circuit relied on the following facts: (i) "the government's agent . . . made clear that many people who have 'nothing to do with drug trafficking' honor Jesus Malverde, undercutting any suggestion that the image on the cell phone compelled the conclusion that [the defendant] was involved in drug

trafficking"; and (ii) "the government in its closing rebuttal argument markedly downplayed the significance of the cell phone image, telling the jury that the image of Malverde was 'the least influential circumstance that you should rely upon in this case.'"  United States v. Uriarte-Acosta, 304 F.App'x at 554.

Various district court judges in border states have permitted evidence regarding Santa Muerte and Jesus Malverde for the purpose of showing it is a tool of the trade of drug traffickers.  The Honorable Robert C. Brack, United States District Judge, stated the following: "In that these authorities demonstrate that cultural icons such as the Santa Muerte and Jesus Malverde are associated with drug smugglers, evidence of the prayer to the Santa Muerte would be highly relevant to the issue of knowledge."  United States v. Favela-Lujan, No. 10-3232, Memorandum Opinion and Order at 4, filed January 21, 2011 (Doc. 35)(D.N.M.)(Brack, J.)("Favela-Lujan Opinion")(citing United States v. Lopez-Gutierrez, 334 F.App'x at 882; United States v. Pena-Ponce, 588 F.3d at 582).  Judge Brack rejected an argument that rule 403 counseled in favor of excluding the evidence in light of the lack of demonstration of unfair prejudice.  See Favela-Lujan Opinion at 4-5.  The Western District of Texas similarly found Almonte's testimony regarding Santa Muerte to be reliable in light of him having spent "much of his career studying Santa Muerte and, in particular, the worship of this figure among individuals in criminal organizations along the United States-Mexico border."  Guererro Opinion at 3.  The Western District of Texas rejected the argument that Almonte's expert opinion was "junk science," and emphasized that "Mr. Almonte's area of expertise is not regularly studied or analyzed in traditional academia and does not lend itself well to established scientific review."  Guererro Opinion at 3-4.  The Western District of Texas related that "Mr. Almonte has developed extensive, specialized, and accurate knowledge of Santa Muerte without engaging in formal scientific review."  Guererro Opinion at 4 ("The apparent

thoroughness of Mr. Almonte's research and his status among his colleagues indicate that he is not a 'hired gun' but is instead 'a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers.'").   Addressing a case involving Jesus Malverde, Judge Johnson from the District of New Mexico stated the following about Almonte's expert opinion:

Defendant asserts that Marshal Almonte's opinion is not reliable because it is too huge a leap "to go from cell phones [and] pagers to religious belief as a "tool of the trade." Tr. at 76. Defendant argues that such a broad definition of "tool of the trade" would allow the Government to target individuals who wear the Christian cross as drug traffickers because a large number of people who are Christians wear crosses. The Government aptly finds the holes in this argument. Drug trafficking does not have the same connection to the Christian cross as does Jesus Malverde paraphernalia. The cross, or the worship of legitimate saints, are common symbols used for a multitude of purposes. They both have a "less frequent appearance" in drug trafficking cases than does paraphernalia associated with Jesus Malverde or Santa Muerte. See Tr. at 85. There is no indication that the wearing of a Christian cross occurs in the context of drug trafficking frequently enough to infer a connection between the two, so there is no danger that individuals will be targeted for their religious beliefs, as Defendant contends. Moreover, prayer to Jesus Malverde, as opposed to legitimate saints, holds the dubious distinction of seeking protection from law enforcement. As the Government noted at the hearing, "Jesus Malverde is for people that operate outside the law." Tr. at 88.

Defendant also infers that the proffered testimony attempts to profile individuals by their socioeconomic level because Jesus Malverde is revered largely by "poor and marginalized Mexican Catholics." Tr. at 81. However, the statistical reality is that the overwhelming population in the Sinaloa area in Mexico are poor. Further, the fact that Jesus Malverde paraphernalia was found on Defendant -- who is not from Mexico, but is an American who allegedly "just so happen[ed] to be on a drug run" (Tr. at 86) undercuts any attempt to tie the proffered testimony to a specific socioeconomic class.

Opinion testimony on "tools of the trade" is not the kind of subject that lends itself to technical scientific inquiry. Nevertheless, reliability on this subject matter is established through the collective knowledge and experience of law enforcement officials. Marshal Almonte testified at the hearing that his opinion on the connection between Jesus Malverde paraphernalia and drug trafficking is accepted by peers in law enforcement. Tr. at 68.

There is no reason to re-invent the wheel here: the reliability of expert

-37-

testimony dealing with "tools of the trade" has been well recognized by courts, including the Tenth Circuit.  See, e.g., U.S. v. Burkley, 513 F.3d 1183, 1189 (10th Cir. 2008)(expert witness testified that defendant's possession of more than one cell phone was a common practice in drug trade)(citing U.S. v. Cox, 934 F.2d 1114, 1121 (10th Cir. 1991)(indicating that possession of pager is evidence of intent to distribute)); U.S. v. Perez, 280 F.3d 318, 342 (3rd Cir. 2002)(expert testimony presented to explain how drug traffickers use cell phones to frustrate police investigators who are trying to find the location of a drug delivery or to intercept numeric coded messages).

United States v. Bobadilla-Campos, 839 F.Supp.2d at 1235.

As a preliminary note, the factors from Daubert v. Merrell Dow Pharmaceuticals do not neatly apply to the proposed expert testimony.  The Supreme Court has recognized this scenario:

Our emphasis on the word may thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 150 (citations omitted)(internal quotation marks omitted)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  Testing in the scientific sense of the word does not occur in the field when officers pursue drug traffickers.   While there are commentators on law enforcement practices, the Court assumes that law enforcement agencies do not generally publish law enforcement techniques in peer-reviewed journals or in books.  A potential rate of error for law-enforcement techniques, unlike an experiment, is difficult to quantify.  The Supreme Court gives as an example when discussing rate of error "the error rate of spectrographic

-38-

voice identification technique." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594.  Standards

in the scientific sense do not normally apply to law-enforcement techniques, such as a "professional

organization's standard governing spectrographic analysis." Daubert v. Merrell Dow Pharm., Inc.,

509 U.S. at 594.  There is no relevant medical or scientific community, although, as outlined above,

the federal court system and the Tenth Circuit have generally accepted expert testimony on the

modus operandi of drug organizations as reliable.  See United States v. Garza, 566 F.3d at 1198-

1200.  There are different factors courts have considered that are more directly applicable to this

case such as whether the witness' conclusion represents an "unfounded extrapolation" from the data;

whether the witness has adequately accounted for alternative explanations for the effect at issue;

whether the opinion was reached for the purposes of litigation or as the result of independent studies;

or whether it unduly relies on anecdotal evidence.  Witherspoon v. Navajo Ref. Co., LP, 2005 WL

5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. at 146).

        Almonte's expert opinion relies largely on his experience as a law enforcement officer.  The

Tenth Circuit has acknowledged that experience and training are generally the basis upon which

experts rely to provide testimony regarding the modus operandi of drug organizations.  See United

States v. Garza, 566 F.3d at 1199-1200.  The advisory committee's notes to rule 702 provide the

following guidance: "If the [expert] witness is relying solely or primarily on experience, then the

witness must explain how that experience leads to the conclusion reached, why that experience is

a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R.

Evid. 702 advisory committee's note to 2002 amendment.  Nothing about Almonte's opinion

appears to be an "unfounded extrapolation," given that various courts have recognized that evidence

relating to so-called narco saints may be legitimate evidence that drug trafficking took place.  See

Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3.  Almonte accounts for alternative

explanations in that he acknowledges that many law-abiding citizens honor Santa Muerte. Furthermore, he and other law enforcement officers use these principles in the field to evaluate whether individuals are engaged in criminal activity.  Consequently, Almonte is not arriving at these opinions solely for the purposes of litigation.  It is also helpful to look at how the United States seeks to use this evidence in a circumstantial manner to prove that there was a conspiracy to distribute drugs and how courts have generally recognized the evidentiary value of circumstantial evidence to prove such matters.  The United States proposes to use this circumstantial evidence to prove that there was a conspiracy to distribute drugs.  As the Tenth Circuit has stated: "Circumstantial evidence is often the strongest evidence of conspiracy."  United States v. Robinson, 978 F.2d 1554, 1562 (10th Cir. 1992).  As both the Supreme Court and the Tenth Circuit have recognized, an individual's "knowledge must almost always be proved . . . by circumstantial evidence." United States v. Santos, 553 U.S. 507, 521 (2008).  Accord United States v. Wright, 412 F.App'x 54, 56 (10th Cir. 2011)(unpublished)("Intent to distribute may be inferred from circumstantial evidence, including a large drug quantity.").  As the Tenth Circuit has discussed in a case where it was disputed whether there was sufficient evidence to conclude that a defendant "knowingly has ownership, dominion or control over the narcotics and the premises where the narcotics are found":

> Most of the evidence against Mr. Gonzalez was circumstantial; yet, a rational jury could conclude that he had mutual control over the small bathroom where cocaine was found and that he knowingly possessed the drugs.  A rational jury could also find -- based on the large quantity of cocaine in the apartment and the scales in the closet -- that the cocaine was intended for distribution, rather than personal use. We hold that the evidence supported Mr. Gonzalez' conviction on the possession with intent to distribute count.

United States v. Dozal, 173 F.3d 787, 797 (10th Cir. 1999).  In fact, the Tenth Circuit has characterized evidence of tools of the trade as circumstantial evidence.  See United States v. McDonald, 933 F.2d at 1522 ("The possession of the remaining tools of the trade, the pager and the

loaded pistol, are likewise circumstantial evidence.").  There is also no indication that Almonte unduly relies on anecdotal evidence.  He has extensive firsthand experience in the field of law enforcement and with so-called narco saints.  The Western District of Texas has made specific findings about Almonte's experience that are relevant here:

> Mr. Almonte has spent much of his career studying Santa Muerte and, in particular, the worship of this figure among individuals in criminal organizations along the United States-Mexico border.  The Government elicited testimony indicating that Mr. Almonte has committed thousands of hours to Santa Muerte research and has lectured on Santa Muerte's prevalence among narcotics cartels at hundreds of law enforcement educational seminars across Texas and throughout the nation. Additionally, after several years of research, Mr. Almonte produced an educational video entitled Patron Saints of the Mexican Drug Underworld, in which Santa Muerte is discussed, along with other entities.

Guererro Opinion at 3.  In light of these considerations, the Court cannot say that Almonte has an unreasonable basis for his conclusions, a lack of a sufficient basis for his opinion, or that he has in an unreliable manner applied his experience to the facts of the case.  Accordingly, the Court finds that Almonte's opinion is reliable.

At the hearing on July 30, 2012, the Defendants objected to the use of various terms, such as narco saint and tools of the trade, on the basis that they invade the province of the jury.  See July 30, 2012 Tr. at 6:25-8:2 (Riggs).  The United States informed the Court that it could instruct Almonte to avoid using the term narco saint.  See July 30, 2012 Tr. at 22:3-23:3 (Court, Stanford). Accordingly, given the United States' representation at the hearing on July 30, 2012, it should instruct Almonte that he should not use the term narco saint.

## III.   **ALMONTE'S PROPOSED TESTIMONY DOES NOT VIOLATE RULE 704(b).**

Furthermore, that Almonte's proposed testimony bears on the Defendants' intent does not mean that it is improper expert testimony under rule 704(b).  Rule 704(b) provides: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have

a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  Fed. R. Evid. 704(b).  Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or to opinions from which the jury may conclude or infer that the defendant had the requisite mental state.  See United States v. Torres, 53 F.3d at 1141-42. In making such a determination, a court should consider whether the question tracks the language of the legal principle or statute at issue, and then consider whether any terms employed have a specialized legal meaning.  See United States v. Perkins, 470 F.3d at 158.  The United States should instruct Almonte that he should not phrase his testimony in terms of opining on the Defendants' mental state -- specifically whether they intentionally or knowingly were conspiring to distribute drugs, or whether they knew drugs were in the car.  He may testify that he is aware that Santa Muerte materials have been present in other situations where a drug conspiracy occurred and explain why these materials have been present when drug trafficking in other cases took place.  He may testify about what he has seen in previous drug cases.  He may not, however, testify that the Defendants intentionally or knowingly engaged in drug trafficking based on the surrounding circumstances, or that they knew that they had drugs in the vehicle.  "Those matters are for the trier of fact alone."  Fed. R. Evid. 704(b).

## IV.   ALMONTE'S PROPOSED TESTIMONY IS NOT IMPROPER PROFILE EVIDENCE.

The Defendants argue that Almonte's proposed evidence is improper profile evidence that the Court should exclude.  The Tenth Circuit has described profile evidence as follows: "[A] profile is simply an investigative technique.  It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity."

United States v. Robinson, 978 F.2d at 1563.  "A more tailored definition was offered in Florida v. Royer, 460 U.S. 491, 493 . . . (1983), where drug courier profile was described as an abstract of characteristics found to be typical of persons transporting illegal drugs." United States v. Robinson, 978 F.2d at 1563 (internal quotation marks omitted).  "Courts have condemned the use of profiles as substantive evidence of guilt."  See United States v. Robinson, 978 F.2d at 1563.  The Tenth Circuit has explained the difference between profile evidence and evidence that the prosecution may circumstantially use to prove criminal activity:

> We decline to classify the testimony offered in this case as mere "profile" evidence.  Courts which have dealt with the issue effectively decided that the characteristics that make up the profile were indicators of a specific illegal activity, most usually the transportation of drugs.  Generally, profiles are used to detect crime, before the police have investigated or gathered evidence.  Conversely, here, the alleged profile characteristics did not necessarily indicate, nor did the expert equate the characteristics to, a specific criminal activity.  Rather, the expert testified that these particular items and clues lead him to the conclusion that the defendants were gang members.  This evidence was used after the investigation was complete to explain the items found in the possession of the defendants.  The prosecution was later able to connect gang membership to the uncontroverted evidence that the main purpose of the Crips[7] was to traffic in crack cocaine.

---

[7]Wikipedia states the following about the Crips:

> The Crips are a primarily, but not exclusively, African-American gang.  They were founded in Los Angeles, California, in 1969 mainly by Raymond Washington and Stanley Williams.  What was once a single alliance between two autonomous gangs is now a loosely connected network of individual sets, often engaged in open warfare with one another.

> The Crips are one of the largest and most violent associations of street gangs in the United States, with an estimated 30,000 to 35,000 members.  The gang is known to be involved in murders, robberies, and drug dealing, among many other criminal pursuits.  The gang is known for its gang members' use of the color blue in their clothing.  However, this practice has waned due to police crackdowns on gang members.

> Crips are publicly known to have an intense and bitter rivalry with the Bloods and lesser feuds with some Chicano gangs.  Crips have been documented in the U.S.

United States v. Robinson, 978 F.2d at 1563.  The Tenth Circuit has emphasized that there must but

"other evidence showing guilt" to support a conviction rather than just "profile evidence."  United

States v. McDonald, 933 F.2d at 1521.  Profile evidence is distinguishable from proper evidence

regarding the modus operandi or tools of the trade of drug organizations largely based on "whether

a juror would be able to understand the evidence without specialized knowledge concerning the

subject":

> Rather than focusing our inquiry upon defining and classifying evidence into categories of profile or non-profile, we believe the better approach is to commence our inquiry with an examination of the applicable rules of evidence.  Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence.  Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject.

> In the case before us the evidence was specialized.  Defendant possessed 6.7 grams of rock cocaine.  A person possessing no knowledge of the drug world would find the importance of this fact impossible to understand.  The average juror would not know whether this quantity is a mere trace, or sufficient to pollute 1,000 people.

> The next items of evidence can best be described as a drug dealer's tools of trade: a single-edge razor blade, a pager or beeper, and a loaded pistol.  Is the possession of these items something the jury can understand without the benefit of specialized knowledge?

> We observe the razor blade is at least circumstantial evidence suggesting Defendant possessed the means to cut the rock cocaine and thus intended to distribute.  The possession of the remaining tools of the trade, the pager and the loaded pistol, are likewise circumstantial evidence.  The proper inquiry concerning expert evidence is simply whether the jury is able to understand the evidence without the specialized knowledge that is available from the testimony of an expert witness.

> The $990 cash and $20 in food stamps were the next items of evidence to be considered.  Why would someone have such a large quantity of money and food

---

military, found in bases in the United States and abroad.

Crips, Wikipedia, http://en.wikipedia.org/wiki/Crips (last visited August 2, 2012)(emphasis omitted)(footnote omitted).

stamps upon his person?  Without understanding the drug trade is a cash-and-carry business, and that both cash and food stamps are the medium of exchange in a drug transaction, the basic evidence would leave a juror puzzled.  A jury could not understand the significance of this evidence without the particular background knowledge of how a drug dealer works.

These are not subjects with which most jurors are familiar.

United States v. McDonald, 933 F.2d at 1522 (footnotes omitted).

Profile evidence is primarily a concern when a court is reviewing Fourth Amendment issues and deciding whether the police's actions complied with the Fourth Amendment.  See United States v. McDonald, 933 F.2d at 1521 ("The common use of profile evidence is to make investigative stops.  Courts have frequently upheld investigative stops based upon profile characteristics.").  Almonte was not the arresting officer, and appears to have no connection with the underlying investigation and arrest.  His testimony falls within the category of "evidence . . . used after the investigation was complete to explain the items found in the possession of the defendants" and to connect them to criminal activity.  United States v. Robinson, 978 F.2d at 1563.  Furthermore, the Court has already held that the proposed expert testimony would be helpful to the jury, because the matters Almonte will discuss are generally outside a given juror's common knowledge.  Thus, the proposed testimony is not excludable on the basis that it is profile evidence.  See United States v. McDonald, 933 F.2d at 1522.  The United States should instruct Almonte, however, not to use the word profile to avoid putting the idea of profile evidence in the minds of the jury.  There is no need for him to use this term.

## V.   THE COURT WILL NOT EXCLUDE THE EVIDENCE UNDER THE FIRST AMENDMENT OR THE RULES OF EVIDENCE.

The Defendants argue that the Court should exclude Almonte's testimony under rule 403 in light of the potential of unfair prejudice as well as the religious implications the evidence raises.

The Court concludes that these arguments are not persuasive.  Neither rule 610 nor the First Amendment require exclusion of this evidence.  Furthermore, the risk of unfair prejudice the evidence would create does not substantially outweigh its probative value.  Courts have permitted evidence of religious beliefs in a case to prove various matters, including motive or criminal intent. The Defendants cite no authority for the proposition that evidence of a defendant's religious affiliation is per se inadmissible.

A.    **THE COURT WILL NOT EXCLUDE THE SANTA MUERTE EVIDENCE UNDER RULE 610 SOLELY ON THE BASIS THAT IT IS RELIGIOUS IN NATURE.**

Rule 610 provides: "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." Fed. R. Evid. 610.  As a leading evidence treatise has stated: "The rule [stated in rule 610] does not bar evidence that is offered to prove something other than the effect of the witness's religion on his or her credibility . . . . Evidence as to a defendant's religious affiliations was properly admitted when it established a possible motive in a criminal case." 4 J. Weinstein & M. Berger, supra § 610.03[2], at 610-4 to 610-5.  In a criminal case, the Seventh Circuit noted that the evidence of the defendant's religious affiliation "was probative of whether [he] intended the letter to constitute a 'true threat.'"  United States v. Hoffman, 806 F.2d at 708.

The Eleventh Circuit has stated: "A person's beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution." United States v. Beasley, 72 F.3d at 1527.  The Eleventh Circuit explained:

> It seems clear from the record that the Yahweh religion was not on trial.  The evidence regarding the religion was relevant, because religious teachings were used to justify, rationalize, and promote crime.  Appellants argue strenuously that the contested evidence violated Federal Rule of Evidence 610, which prohibits using religion to impeach a witness's credibility.  The appellants' argument is misguided. The government agrees that it would have been improper to attack witnesses' credibility with their religious beliefs by suggesting that, because of those beliefs,

their testimony was untrustworthy.  However, in this case, the government inquired into Yahweh practices and beliefs in an effort to show the background of the RICO enterprise, which the defendants used to carry out acts of murder and arson.  The evidence was relevant to show how Yahweh exerted influence and control over the members and how he used his preachings to justify heinous crimes.

United States v. Beasley, 72 F.3d at 1527.  In an unpublished decision, the Sixth Circuit quoted approvingly the Eleventh Circuit's holding from United States v. Beasley.  See United States v. Shalom, 113 F.3d 1236, 1997 WL 225514, at *4.

All the authority the Court has located undercuts the Defendants' argument that evidence of a defendant's religious beliefs is per se excludable.  The Defendants cite no authority for their argument and, in fact, did not raise it until the Court held a hearing on the Motion in Limine.  While the Court acknowledges that religious matters may be sensitive and that a court should not permit the parties to delve into them without a good faith basis for doing so, religious matters can often be an important aspect of the case and a permissible topic during a case.  As the Court has stated before in the context of voir dire:

> Congress and the courts have been particularly sensitive to not introduce religious views unnecessarily into cases.  Rule 610 of the Federal Rules of Evidence prohibits a party [from attacking] attack the credibility of a witness because of his religious views or lack thereof: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."  If witnesses cannot be so challenged, the Court should be cautious about permitting the parties to question prospective jurors along similar lines.

> On the other hand, a defendant should be able, while remaining sensitive to undue intrusion into a prospective juror's religious beliefs, views, and practices, to inquire whether a juror has any view, religious or otherwise, that would preclude him from being a fair and impartial juror in this case.  If there is someone that is prejudiced for or against someone of a particular faith, the defendant should be able to detect that attitude.

United States v. Sandoval, 2006 WL 1304955, at *5.  Thus, the Court will assess the religious nature of the evidence under rule 403 as opposed to under some independent legal ground for exclusion of

the evidence outside of rule 403.

**B.   THE FIRST AMENDMENT DOES NOT REQUIRE EXCLUSION OF THIS EVIDENCE.**

Medina-Copete argues that the admission of this evidence infringes on her religious freedom. She cites no authority for this proposition and does not provide the Court with much guidance as to the contours of her argument.  The First Amendment provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  There are two operative clauses in the First Amendment, "the Establishment Clause and the Free Exercise Clause."  Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 132 S.Ct. 694, 702 (2012)("We have said that these two Clauses 'often exert conflicting pressures,' and that there can be 'internal tension . . . between the Establishment Clause and the Free Exercise Clause.'" (citations omitted)).  Accord Walz v. Tax Comm'n of N.Y., 397 U.S. 664, 673 (1970)("The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.  To equate the two would be to deny a national heritage with roots in the Revolution itself.").  The basic purpose of the Establishment Clause is to make unconstitutional laws that either advance or inhibit a given religion; the government should not establish or prefer one religion over another, or discriminate against or disfavor a religion.  See Walz v. Tax Comm'n of N.Y., 397 U.S. at 672 ("The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility.").  The basic purpose of the Free Exercise Clause is to prevent the government from passing laws that "discriminate[] against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993)("At a minimum, the protections of the Free

Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."). "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 885 (1990), superseded by statute on other grounds 42 U.S.C. § 2000bb-1(b).

### 1.   Presenting this Evidence Regarding Santa Muerte Does Not Violate the Establishment Clause.

Medina-Copete does not clarify the scope of her First Amendment argument, including whether she raises an Establishment Clause argument at all. She complains that the admission of the Santa Muerte evidence violates her First Amendment rights on the basis that it interferes with her freedom of religion. The Court will analyze her argument in the context of the rules of evidence that permit introduction of that evidence and the relevant criminal statutes under which she faces charges for drug-related conduct.

Rule 610 provides: "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." Fed. R. Evid. 610. In an unpublished decision, the United States Court of Appeals for the Fifth Circuit found that admission of "evidence of a prayer card found in [the defendant's] purse" did not violate rule 610 or the First Amendment, although the Fifth Circuit only briefly addressed the matter:

> Rutiaga also challenges, on the basis of Fed.R.Evid. 610, and the First Amendment, the district court's admission into evidence of a prayer card found in her purse. The card bore a prayer to Saint Norbert, asking him to "keep away the evil, because you are the owner of jails and prisons, close their doors to me so I will never go into them." Because Rutiaga did not testify, the Government did not violate Rule 610 by attempting to use her religious beliefs or opinions to impeach her credibility. The prayer card was used to show knowledge and intent. It was therefore relevant, and it probative value outweighed any prejudicial effect. The

district court did not abuse its discretion in admitting the prayer card at trial.

United States v. Rutiaga, 220 F.3d 585, 2000 WL 959589, at *1 (5th Cir. 2000)(per curiam)(unpublished table decision).  While rule 610 refers to religion, it is neutral in that it does not distinguish between given religions such that it advances or inhibits a given religion.  See Larson v. Valente, 456 U.S. 228, 260 (1982)(stating that a Court should evaluate a law under the three-part test in Lemon v. Kurtzman, 403 U.S. 602 (1971), when a law "afford[s] uniform benefit to all religions" rather than "discriminate[s] among religions").  Even if a law is "facially neutral, 'the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.'"  Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 307 n.21 (2000).  To survive an Establishment Clause challenge, a facially neutral law: (i) "must have a secular legislative purpose"; (ii) "its principal or primary effect must be one that neither advances nor inhibits religion"; and (iii) "must not foster 'an excessive government entanglement with religion.'" Lemon v. Kurtzman, 403 U.S. at 612-13.[8]  Rule 610's purpose is secular in that it is designed to avoid a jury drawing improper inferences about a witness' character or credibility in light of the witness' religious beliefs, and to avoid distracting from the key issues at trial:

> The second policy assumption underlying Rule 610 is compelling for the very reason that many people presume a strong connection between religious belief and moral character; evidence of religious belief or lack thereof may be highly prejudicial.  Such evidence may cause prejudice in at least four ways.  First, since many presume a strong connection between religious belief and moral character, the jury may overweigh the extent to which evidence of religious belief or lack thereof

---

[8]"'Although the Supreme Court is sharply divided' on whether Lemon remains valid law, this court 'has recently affirmed that the touchstone for Establishment Clause analysis remains the tripartite test set out in Lemon.'"  Awad v. Ziriax, 670 F.3d 1111, 1126 n.10 (10th Cir. 2012)(quoting Am. Atheists, Inc. v. Davenport, 637 F.3d 1095, 1117 (10th Cir. 2010), cert. denied, Utah Highway Patrol Ass'n v. Am. Atheists Inc., 132 S.Ct. 12, 181 L.Ed.2d 379 (2011)).

is probative of truthfulness or untruthfulness.  Second, such evidence may distract from the question of the witness's truthfulness and induce the jury to weigh testimony in light of the extent to which the witness's religious beliefs are acceptable.  Third, where the witness is a party, the jury may use the evidence of religious beliefs to draw inferences about his actions in the case.  Finally, evidence of the religious beliefs of a party witness might induce a jury to simply ignore the issues and base a verdict on the extent to which those beliefs are acceptable.

28 C. Wright, V. Gold, & M. Graham, Federal Practice and Procedure § 6152, at 309-10 (1993).

That rule 610 permits evidence of witness' religion for other purposes is consistent with the general principle that a party may present circumstantial evidence that bears on a relevant matter, including motive and knowledge.  See United States v. Beasley, 72 F.3d at 1527 ("A person's beliefs, superstitions, or affiliation with a religious group is properly admissible where probative of an issue in a criminal prosecution.").  As both the Supreme Court and the Tenth Circuit have recognized, an individual's "knowledge must almost always be proved . . . by circumstantial evidence." United States v. Santos, 553 U.S. at 521.  Accord United States v. Wright, 412 F.App'x at 56 ("Intent to distribute may be inferred from circumstantial evidence, including a large drug quantity.").  Rule 610, in many instances, bars evidence of a person's religious belief, and other rules of evidence regarding relevancy would keep that evidence out in many cases.  Thus, it does not have the principal effect of advancing or inhibiting religion.  This rule of evidence, which creates no substantive law and creates no relationship between governmental entities and religious principles, does not foster excessive entanglement with religion.  Consequently, introducing the evidence under rule 610 would not violate the Establishment Clause.

The Court believes that Medina-Copete primary argument is not an Establishment Clause argument, but rather an argument under the Free Exercise Clause.  Introduction of the evidence is not a matter that advances or inhibits a particular religion, or that establishes one religion over another.  Medina-Copete has not identified what religion introduction of the evidence would

establish or favor.  Introduction of the Santa Muerte prayer and statute does not establish or favor Christianity or any subset of Christianity.  Introducing the evidence does not condition governmental privileges, benefits, or protections on Medina-Copete believing in a given religion.  Nor does it violate any non-preferential principle.  See Wallace v. Jaffree, 472 U.S. 38, 106 (1985)(Rehnquist, J., dissenting)("The Establishment Clause did not require government neutrality between religion and irreligion nor did it prohibit the Federal Government from providing nondiscriminatory aid to religion.").  While the religion associated with Santa Muerte is the only one that is at issue, the introduction of the evidence does not seek to punish Medina-Copete for worshiping Santa Muerte, but only for having drugs in her possession.  While worshipers of Santa Muerte are at a disadvantage because they may be suspected of and successfully prosecuted for drug activity more than non-worshipers of Santa Muerte, the presence of prayers and statues is not a necessary or sufficient condition for a criminal conviction.  The Court has difficulty saying that the evidence violates the non-preferential principle of the Establishment Clause if the religion is neither a necessary or sufficient reason for a criminal conviction.

There are three drug charges brought against the Defendants: (i) Count 1 - conspiracy under 21 U.S.C. § 846[9] to commit possession with intent to distribute 50 grams and more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A);[10] (ii) Count 2 - possession with intent to distribute 50 grams and more of methamphetamine in violation of 21 U.S.C.

---

[9]This statute provides: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  21 U.S.C. § 846.

[10]21 U.S.C. § 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."  21 U.S.C. § 841(a)(1).

§ 841(a)(1) and (b)(1)(A); and (iii) Count 3 - carrying and using a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A).[11] See Superseding Indictment at 1-2, filed May 8, 2012 (Doc. 59). There is no plausible argument that these statutes facially advance or inhibit a given religion, as they make no direct or indirect reference to any kind of religion. Nevertheless, even if a law is "facially neutral, 'the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.'" Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 307 n.21 (2000). To survive an Establishment Clause challenge, a facially neutral law: (i) "must have a secular legislative purpose"; (ii) "its principal or primary effect must be one that neither advances nor inhibits religion"; and (iii) "must not foster 'an excessive government entanglement with religion.'" Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). All these statutes have a secular purpose, to punish drug and gun offenders. Medina-Copete has made no argument, and the Court sees no reasonable basis to conclude that, the

---

[11]18 U.S.C. § 924(c)(1)(A) provides:

Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --

    (i)     be sentenced to a term of imprisonment of not less than 5 years;

    (ii)    if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

    (iii)   if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

"principal or primary effect" of these statutes is that they advance or inhibit religion.  Lemon v. Kurtzman, 403 U.S. at 612-13.  Likewise, she has made no argument, and the Court sees no reasonable basis to conclude that, these statutes foster an excessive government entanglement with religion.  The statutes have no connection to religion and have, at most, remote impact on religious practices -- such as on cultures or religions who use drugs as part of religious rituals.  See Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. at 890 (rejecting a Free Exercise Clause argument that a law forbidding the use of peyote violated the First Amendment).  Thus, introducing evidence that has a connection to religion to secure a conviction under these criminal drug statutes does not violate the Establishment Clause.

<strong>2.      Presenting this Evidence Regarding Santa Muerte Does Not Violate the Free Exercise Clause.</strong>

Medina-Copete does not clarify the scope of her First Amendment argument.  She complains that the admission of the Santa Muerte evidence violates her First Amendment rights on the basis that it interferes with the exercise of her beliefs.  The Court will analyze her argument in the context of the rules of evidence that permit introduction of that evidence and the relevant criminal statutes under which she faces charges for drug-related conduct.  The Free Exercise Clause primarily protects beliefs.  The issue is whether the introduction of Medina-Copete's beliefs and prayers violates her free-exercise rights.  Nothing in the introduction of the evidence punishes her for her beliefs.  She remains free before and after trial to believe what she wants.  Nothing prevents the other two million believers in Santa Muerte from continuing those practices.  While it might be argued that the introduction of the Santa Muerte evidence places a burden on the exercise of her religion, it is incidental and not great enough to violate the Constitution.  She is facing punishment for the drugs and gun found in her possession, not for her beliefs.  Her religious beliefs are neither

-54-

sufficient or necessary conditions for criminal punishment.

Rule 610 provides: "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." Fed. R. Evid. 610. The basic purpose of the Free Exercise Clause is to prevent the government from passing laws that "discriminate[] against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. at 532 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."). A law is subject to strict scrutiny under the Free Exercise Clause when it lacks "facial neutrality" in that "it refers to a religious practice without a secular meaning discernable from the language or context." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. at 533.[12] The purpose of rule 610 is secular in that it is designed to avoid a jury drawing improper inferences about a witness' character or credibility in light of the witness' religious beliefs, and to avoid distracting from the key issues at trial:

> The second policy assumption underlying Rule 610 is compelling for the very reason that many people presume a strong connection between religious belief and moral character; evidence of religious belief or lack thereof may be highly prejudicial. Such evidence may cause prejudice in at least four ways. First, since many presume a strong connection between religious belief and moral character, the jury may overweigh the extent to which evidence of religious belief or lack thereof is probative of truthfulness or untruthfulness. Second, such evidence may distract from the question of the witness's truthfulness and induce the jury to weigh testimony in light of the extent to which the witness's religious beliefs are acceptable. Third, where the witness is a party, the jury may use the evidence of

[12]A law that promotes the "covert suppression of particular religious beliefs" by "target[ing] religious conduct for distinctive treatment" is also subject to strict scrutiny even if the law is facially neutral. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. at 534. There is no evidence before the Court that the drafters of the Federal Rules of Evidence had such intentions. There is also no evidence that the United States has such intentions in introducing the evidence.

religious beliefs to draw inferences about his actions in the case.  Finally, evidence
of the religious beliefs of a party witness might induce a jury to simply ignore the
issues and base a verdict on the extent to which those beliefs are acceptable.

28 C. Wright, V. Gold, & M. Graham, supra § 6152, at 309-10.  That it permits evidence of witness'

religion for other purposes is consistent with the general principle that a party may present

circumstantial evidence that bears on a relevant matter, including motive and knowledge.  United

States v. Beasley, 72 F.3d at 1527 ("A person's beliefs, superstitions, or affiliation with a religious

group is properly admissible where probative of an issue in a criminal prosecution.").  As both the

Supreme Court and the Tenth Circuit have recognized, an individual's "knowledge must almost

always be proved . . . by circumstantial evidence."  United States v. Santos, 553 U.S. at 521.  Accord

United States v. Wright, 412 F.App'x at 56 ("Intent to distribute may be inferred from circumstantial

evidence, including a large drug quantity.").  Rule 610, in many instances, bars evidence of a

person's religious belief, and other rules of evidence regarding relevancy would keep that evidence

out in many cases.  Thus, the Court cannot reasonably conclude that rule 610 is "without a secular

meaning discernable from the language or context."  Church of the Lukumi Babalu Aye, Inc. v. City

of Hialeah, 508 U.S. at 533.  Thus, rule 610 is generally applicable to all cases, and "[t]he

government's ability to enforce generally applicable prohibitions of socially harmful conduct, like

its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a

governmental action on a religious objector's spiritual development.'"  Emp't Div., Dep't of Human

Res. of Or. v. Smith, 494 U.S. at 885.  "[T]he right of free exercise does not relieve an individual

of the obligation to comply with a 'valid and neutral law of general applicability on the ground that

the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  Emp't Div.,

Dep't of Human Res. of Or. v. Smith, 494 U.S. at 885.  Once again, the Court emphasizes that

Medina-Copete provides the Court with very little guidance on what her First Amendment argument

is.  That a neutral and generally applicable rule of evidence permits in, when that matter is relevant, evidence of a person's religion does not infringe upon Medina-Copete's rights under the Free Exercise Clause, even if there is some incidental burden on her religious rights.  See City of Boerne v. Flores, 521 U.S. 507, 513 (1997)("The only instances where a neutral, generally applicable law had failed to pass constitutional muster . . . were cases in which other constitutional protections were at stake.").  Individuals like her may feel more cautious about bringing personal objects related to Santa Muerte with them when they travel, in case law enforcement officers stop their vehicles and are looking for signs of criminal activity, but they will not face criminal penalties because of their beliefs.  Likewise, nothing will prevent these individuals from honoring Santa Muerte, as personal items related to Santa Muerte would be the primary thing that would trigger the suspicion of law enforcement.   The worship of Santa Muerte is not, by itself, something that would subject individuals to criminal penalties.

Two examples help to illustrate the lack of a free-exercise problem.  If a Christian were to write a prayer asking for Jesus' help and protection before committing a murder, the introduction of the note could be relevant to show who might have murdered the person, even if admitting the evidence might discourage Christians from writing out similar prayers in the future.  If a Muslim wrote out a prayer to Allah asking for success in a terrorist attack, the First Amendment would not protect that individual from having that evidence introduced at trial.  Furthermore, it may be necessary to have someone explain who Allah is to an American jury and explain that Muslims pray to Allah in their faith, and so it was likely a Muslim individual who committed the crime rather than a person of a different faith.  The religion is not on trial.  The prayers are not a necessary or sufficient condition of what the government is trying to prove.  While someone might say that the introduction of such evidence discourages people from exercising their faith, the practical effect on

the exercise of religious rights would be relatively minimal.  What the introduction of the evidence discourages would be the acts of murderers and terrorists -- both secular goals.  Few would say that the burden on religion would rise to the level that it unnecessarily interferes with the free exercise of religion.

The same is true for the criminal statutes under which the Defendants face charges.  There are three drug charges brought against the Defendants: (i) Count 1 - conspiracy under 21 U.S.C. § 846 to commit possession with intent to distribute 50 grams and more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); (ii) Count 2 - possession with intent to distribute 50 grams and more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); and (iii) Count 3 - carrying and using a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A).  See Superseding Indictment at 1-2.  A law is subject to strict scrutiny under the Free Exercise Clause when it lacks "facial neutrality" in that "it refers to a religious practice without a secular meaning discernable from the language or context."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. at 533.[13]  None of those statutes refer to religion.  Thus, these statutes are generally applicable to all individuals, and "[t]he government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'"  Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. at 885.  "[T]he right of free exercise does not relieve an individual of the

_____

[13]A law that promotes the "covert suppression of particular religious beliefs" by "target[ing] religious conduct for distinctive treatment" is also subject to strict scrutiny even if the law is facially neutral.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. at 534.  There is no evidence before the Court that Congress had such intentions in adopting these drug statutes.  There is also no evidence that the United States has such intentions through the improper  prosecution of individuals who believe in so-called narco saints.

obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. at 885.  Thus, permitting evidence of the Santa Muerte materials, even if it has some incidental burden on religious freedom, is not a basis to find that these criminal statutes violate Medina-Copete's rights under the Free Exercise Clause.  These criminal drug offenses have no connection to religion and have, at most, remote impact on religious practices -- such as on cultures or religions who use drugs as part of religious rituals.  See Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. at 890 (rejecting a Free Exercise Clause argument that a law forbidding the use of peyote violated the First Amendment).  While someone might say that the introduction of such evidence to prove these convictions would discourage people from exercising their faith, the practical effect on the exercise of religious rights would be relatively minimal. Individuals like Medina-Copete may feel more cautious about bringing personal objects related to Santa Muerte with them when they travel, in case law enforcement officers stop their vehicles and are looking for signs of criminal activity, but they will not face criminal penalties because of their beliefs.  Likewise, nothing will prevent these individuals from honoring Santa Muerte, as personal items related to Santa Muerte would be the primary thing that would trigger the suspicion of law enforcement.  The worship of Santa Muerte is not, by itself, something that would subject individuals to criminal penalties.

### C.   THE COURT WILL NOT EXCLUDE THE EVIDENCE UNDER RULE 403.

Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d at 1375.  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d at 638.  The Tenth Circuit has recently

reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d at 787.  Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter.  See United States v. Rodriguez, 192 F.2d at 951. Evidence is not unfairly prejudicial merely because it damages a party's case.  See United States v. Caraway, 543 F.3d at 1301.  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 453 F.3d at 1301.

The Court will not exclude this evidence under rule 403.  As the Court has already discussed, the proposed expert testimony will be helpful to the jury, because the jury will not necessarily be familiar with how Santa Muerte relates to drug trafficking.  These matters implicate the tools of the narcotics trade, an area which the Tenth Circuit has recognized may require expert assistance to aid the jury.  See United States v. McDonald, 933 F.2d at 1522.  Accord United States v. Solorio-Tafolla, 324 F.3d at 966 ("It is well within the discretion of a district court 'to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar.'").  The evidence regarding Santa Muerte meets the minimum threshold for relevancy under rule 401.  Rule 401 provides: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Rule 401 contains a low threshold for relevance, because "[a]ny more stringent requirement is unworkable and unrealistic."  Fed. R. Evid. 401 advisory committee's note. Furthermore, given jurors' unfamiliarity with this subject matter, excluding the evidence would

create some potential of confusing the jurors.  The Tenth Circuit has recently reminded district

courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise

admissible under the other rules is an extraordinary remedy and should be used sparingly."  United

States v. Smalls, 605 F.3d at 787.  The Tenth Circuit has also acknowledged that circumstantial

evidence is one of the best methods of proving a conspiracy.  United States v. Robinson, 978 F.2d

at 1562 ("Circumstantial evidence is often the strongest evidence of conspiracy.").  Furthermore,

as both the Supreme Court and the Tenth Circuit have recognized, an individual's "knowledge must

almost always be proved . . . by circumstantial evidence."  United States v. Santos, 553 U.S. at 521.

Accord United States v. Wright, 412 F.App'x at 56 ("Intent to distribute may be inferred from

circumstantial evidence, including a large drug quantity.").  In fact, the Tenth Circuit has

characterized evidence of tools of the trade as circumstantial evidence.  United States v. McDonald,

933 F.2d at 1522 ("The possession of the remaining tools of the trade, the pager and the loaded

pistol, are likewise circumstantial evidence.").

      Simply because the evidence bears on religious matters does not mean that the Court should

exclude it.  Both parties agree that the Catholic faith does not recognize Santa Muerte as an official

saint.  Wikipedia describes Santa Muerte as "probably a syncretism between Mesoamerican and

Catholic beliefs" Santa Muerte, Wikipedia, http://en.wikipedia.org/wiki/Santa_Muerte (last visited

August 3, 2012).  Thus, given that the Catholic faith does not recognize Santa Muerte as an official

saint, the risk of unfair prejudice is lower, because less Catholic jury members would likely find the

evidence offensive.  If Catholic jury members thought that a drug organization was adopting a

recognized saint for criminal purposes, the risk of those jurors approaching the case in an emotional

manner would be greater.  Judge Johnson has also explained why more traditional religious symbols,

like a cross or a rosary, would be less probative of criminal activity than evidence relating to a so-

called narco saint:

> Drug trafficking does not have the same connection to the Christian cross as does Jesus Malverde paraphernalia. The cross, or the worship of legitimate saints, are common symbols used for a multitude of purposes. They both have a "less frequent appearance" in drug trafficking cases than does paraphernalia associated with Jesus Malverde or Santa Muerte. There is no indication that the wearing of a Christian cross occurs in the context of drug trafficking frequently enough to infer a connection between the two, so there is no danger that individuals will be targeted for their religious beliefs, as Defendant contends. Moreover, prayer to Jesus Malverde, as opposed to legitimate saints, holds the dubious distinction of seeking protection from law enforcement. As the Government noted at the hearing, "Jesus Malverde is for people that operate outside the law."

United States v. Bobadilla-Campos, 839 F.Supp.2d at 1235 (citation omitted). Permitting religious evidence in a case is something courts should approach cautiously, but that does not mean that the evidence has no legitimate value. Intent to commit a crime is a disputed manner in this case that requires an intense evaluation of all the relevant circumstances. The jury will have to make that difficult determination. The Court should be hesitant to exclude evidence that would legitimately aid the jurors in their task. District courts should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787. Voir dire and cross-examination are both effective tools to mitigate any prejudicial effect the evidence will have. The Court finds that the unfair prejudice which the evidence might have does not substantially outweigh its probative value.

To the extent Goxcon-Chagal finds the testimony objectionable[14] in that it does not relate to

---

[14]The Court does not opine whether such a limiting instruction is appropriate or that it will give one. Given that there is a conspiracy charge, the United States may maintain that the evidence is related to Goxcon-Chagal as well as Medina-Copete in light of the conspiracy charges it has brought against them. Furthermore, while Goxcon-Chagal contends the evidence relates only to Medina-Copete, it is not clear what the United States' position on this matter is.

him, he may seek a limiting instruction to that effect and may bring that issue out on cross-examination with Almonte.  While it is true that both the Supreme Court and the Tenth Circuit have recognized "evidence admissible only against some codefendants can create the risk of an unfair trial for the other codefendants," those concerns are more relevant "in complex cases where defendants have markedly different degrees of culpability."  United States v. Hutchinson, 573 F.3d 1011, 1030 (10th Cir. 2009)(citing Zafiro v. United States, 506 U.S. 534, 539 (1993)).  Furthermore, courts have "recognized such prejudice usually can be cured by limiting instructions to the jury."  United States v. Hutchinson, 573 F.3d at 1030 (citing Zafiro v. United States, 506 U.S. at 539).  For instance, the Tenth Circuit upheld a district court's decision not to sever a trial even when one defendants "alleged culpability was far less than that of his codefendants" and much of the evidence would have been admissible against only the more culpable defendant when "the district court offered extensive limiting instructions."  United States v. Hutchinson, 573 F.3d at 1030-31.[15]  Goxcon-Chagal has not

-----

[15]The Tenth Circuit discussed the following limiting instructions that the district court in United States v. Hutchinson gave to the jury:

> Furthermore, limiting instructions are "ordinarily sufficient to cure potential prejudice."  The jury instructions in this case did just that.  Mr. Thompson's jury was specifically instructed which defendants were charged with which predicate act of the racketeering charges against them.  Jurors were further instructed that the murder was a predicate racketeering act only for Mr. Gladney.  They then were instructed that, while Mr. Gladney was charged with seven racketeering acts, Mr. Thompson was charged with four.  And then the court reminded the jury that
>
> > [y]ou must consider whether the Government has proven the guilt of each defendant independently with regard to the specific charges brought against that defendant.  You will return a separate verdict on the charges against each defendant.  You must consider the evidence separately as to each charge against each defendant.  Your verdict as to one defendant should not influence your verdict as to any other.

United States v. Hutchinson, 573 F.3d at 1026 (citation omitted).

directed the Court to any facts that would suggest that Medina-Copete is significantly more culpable than him such that there would be "markedly different degrees of culpability" that may counsel in favor of severance or excluding the evidence.  United States v. Hutchinson, 573 F.3d at 1030.  The only difference between the evidence against the two is that Medina-Copete had some Santa Muerte materials.  Thus, the Court concludes that limiting instructions will be sufficient to cure any prejudice against Goxcon-Chagal from the admission of evidence regarding Santa Muerte materials. The Supreme Court found that the following instructions were sufficient to cure prejudice in a co-defendant situation:

> The District Court properly instructed the jury that the Government had "the burden of proving beyond a reasonable doubt" that each defendant committed the crimes with which he or she was charged.  The court then instructed the jury that it must "give separate consideration to each individual defendant and to each separate charge against him.  Each defendant is entitled to have his or her case determined from his or her own conduct and from the evidence [that] may be applicable to him or to her." In addition, the District Court admonished the jury that opening and closing arguments are not evidence and that it should draw no inferences from a defendant's exercise of the right to silence.  These instructions sufficed to cure any possibility of prejudice.

Zafiro v. United States, 506 U.S. at 541.

## VI.   THE COURT WILL NOT EXCLUDE THE EVIDENCE UNDER CRIMINAL RULE 16.

The Defendants also seek to exclude Almonte's testimony on the basis that the expert Notice the United States provided was not sufficiently specific to satisfy rule 16(a)(1)(g).  "A defendant is entitled, under some circumstances, to request a written summary of expert testimony the United States intends to use in its case-in-chief."  United States v. Gutierrez-Castro, 805 F.Supp.2d at 1227. Rule 16 provides in relevant part:

> **Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its

> case-in-chief at trial.  If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition.  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  As Professor James Moore has stated: "It is not clear how much detail must be provided to satisfy this provision."  25 J. Moore, Moore's Federal Practice § 616.05[3], at 616-65 (3d ed. 2012).  The Seventh Circuit found the following summary of expert testimony sufficient, "although barely," when the government planned to present evidence regarding a drug courier profile:

> In response to your Request for Written Summary of the Government's Proposed Expert Testimony dated December 3, 1993, please be advised that Officers Emmit C. Carney, Jerry Cheung, and R.J. Kenney may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.  In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics.  Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations.

United States v. Jackson, 51 F.3d 646, 651 (7th Cir. 1995).  The Seventh Circuit elaborated that, in "cases involving technical or scientific evidence," there may be a "greater disclosure" obligation, "including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed.R.Evid. 703."  United States v. Jackson, 51 F.3d at 651 (citing Fed. R. Crim. P. 16(a)(1)(E) advisory committee's note).

The Notice provides that the United States will offer Almonte as an expert witness "regarding the use of 'patron saints' by drug traffickers, with specific attention towards Santa Muerte, and how Santa Muerte prayers and icons are 'tools of the trade' for many drug traffickers." Notice at 1.  The Notice relates that "Marshal Almonte has over 25 years of combined state and

federal law enforcement experience, much of it devoted to narcotics enforcement." Notice at 1. "He currently serves as the United States Marshal for the Western District of Texas, which encompasses San Antonio and El Paso." Notice at 1. The United States asserts that "Marshal Almonte has studied various patron saints throughout Mexico for many years." Notice at 1-2. The United States represents:

> His experience in this area, comprising hundreds, if not thousands of hours of study, has led Marshal Almonte to create and produce a law enforcement training video; "Patron Saints of the Mexican Drug Underworld," and he is currently writing a book on this topic. Marshal Almonte has trained several thousand law enforcement officers on this topic throughout the United States over the last seven years. Marshal Almonte has been previously qualified as an expert in federal court on this topic, including at least one such instance in the District of New Mexico. Marshal Almonte's expert testimony, specifically regarding Santa Muerte, has been previously accepted by the district court for the Western District of Texas as admissible evidence. See United States v. Javier Guererro, et al., Criminal No. 09-820 AM, Doc. 454;. [sic] Marshal Almonte's biography and curriculum vitae is attached.

Notice at 2.

The Notice is sufficiently specific. The United States provides the exact subject matter on which Almonte will testify -- the relationship between drug traffickers and Santa Muerte. The United States then lays out Almonte's qualifications. It also directs the Defendants to a video on this matter that Almonte helped create and produce. The Notice then provides the Defendants with a citation to a case in which Almonte has testified. Furthermore, the United States is not seeking to have him testify on a complex scientific or technical area, matters which may require greater disclosure. See United States v. Jackson, 51 F.3d at 651.

Furthermore, even if a sanction were appropriate, the Defendants have not shown any prejudice in light of the extensive outline the United States gave regarding Almonte's proposed testimony at the hearings on July 25 and July 30, 2012. See United States v. Charley, 189 F.3d

1251, 1262 (10th Cir. 1999)("Frequently it will be found that the party who requested disclosure has

not been prejudiced and that no sanction is needed.").  The Tenth Circuit has also stated: "We note

that the sanction requested by Defendant -- exclusion of the witnesses' expert testimony -- is almost

never imposed 'in the absence of a constitutional violation or statutory authority for such

exclusion.'"  United States v. Charley, 189 F.3d at 1262.

      **IT IS ORDERED** that the Defendants' Motion in Limine to Exclude Unqualified Expert

Testimony II, filed July 16, 2012 (Doc. 73), is denied.

                                _____
                                UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Jon K. Stanford
Raul Torrez
  Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Joseph W. Gandert
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

      *Attorneys for Defendant Rafael Goxcon-Chagal*

Joseph Riggs
Albuquerque, New Mexico

      *Attorney for Defendant Maria Vianey Medina-Copete*